2019 IL App (2d) 180124

Nos. 2-18-0124 & 2-18-0125 cons.

Opinion filed July 24, 2019

_____

## IN THE

## APPELLATE COURT OF ILLINOIS

## SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Du Page County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 15-DT-2963 |
| LAWRENCE J. LENZ, | ) ) ) | Honorable Anthony V. Coco, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Du Page County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 15-TR-99963 |
| LAWRENCE J. LENZ, | ) ) ) | Honorable Anthony V. Coco, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

PRESIDING JUSTICE BIRKETT delivered the judgment of the court, with opinion. Justices Hutchinson and Schostok concurred in the judgment and opinion.

## OPINION

¶ 1    Following a two-day bench trial on September 27 and October 27, 2017, the trial court convicted defendant, Lawrence J. Lenz, on all counts in two separate cases, Nos. 15-DT-2963 and 15-TR-99963. The cases arose from two separate traffic incidents that occurred on the same

day.   On appeal, defendant argues for the vacatur of his convictions in No. 15-TR-99963, because that case was set for status, not trial, on September 27 and October 27, and therefore his due process rights were violated when the trial court adjudicated the counts.   As for No. 15-DT-2963, defendant argues that  (1) the court erred when it allowed, and relied on, testimony concerning No. 15-TR-99963; (2) the court erred in admitting the results of chemical testing of defendant's urine; and (3) the evidence was insufficient to support defendant's convictions.  For the following reasons, we vacate defendant's convictions in No. 15-TR-99963 but affirm his convictions in No. 15-DT-2963 and remand the cause.

¶ 2                              I. BACKGROUND

¶ 3                          A. Pretrial Proceedings

¶ 4      Defendant was charged with two sets of traffic offenses arising from separate incidents on November 3, 2015.  In No. 15-TR-99963, defendant was charged with three counts alleging offenses that occurred at 1:59 p.m. in Naperville.   Count I charged defendant with leaving the scene of an accident involving damage to a vehicle (625 ILCS 5/11-402(a) (West 2014)), a Class A misdemeanor.  Count II alleged failure to reduce speed to avoid an accident (*id.* § 11-601(a)), a petty offense.   Count III alleged failure to provide information after damaging an unattended vehicle (*id.* § 11-404(a)), a Class A misdemeanor.

¶ 5      In No. 15-DT-2963, defendant was charged with four counts alleging offenses that occurred at 2:15 p.m. in Warrenville.  Counts I and IV charged defendant with driving under the influence (DUI), a Class A misdemeanor (*id.* § 11-501(c)(1)).  Specifically, count I alleged that defendant drove while "under the influence of any *** drug or combination of drugs to a degree that render[ed] [him] incapable of safely driving" (*id.* § 11-501(a)(4)), while count IV alleged that defendant drove with an amount of cannabis in his system resulting from unlawful use (*id.*

§ 11-501(a)(6)). Counts II and III charged, respectively, disobeying a traffic-control device (*id.* § 11-305(a)) and failing to reduce speed to avoid an accident (*id.* § 11-601(a)), both petty offenses.

¶ 6    In November 2016, defendant filed a motion *in limine* in No. 15-DT-2963 to exclude the results of testing of a urine sample that he provided following his arrest on November 3, 2015. Defendant contended that the testing did not comply with the standards for urine collection set forth in section 1286.330 of Title 20 of the Illinois Administrative Code (Administrative Code) (20 Ill. Adm. Code 1286.330 (2007)), which was promulgated under section 11-501.2 of the Illinois Vehicle Code (Vehicle Code) (625 ILCS 5/11-501.2 (West 2014)).

¶ 7    The trial court continued the motion *in limine* to September 27, 2017, and also set the case for a bench trial on that date.

¶ 8    As for No. 15-TR-99963, the case was twice set for a bench trial, but both dates were stricken. On July 20, 2017, the trial court set the case for status on September 27, 2017.

¶ 9                                    B. Trial

¶ 10   On September 27, 2017, the trial court called both cases. Defense counsel noted that defendant had signed a jury waiver. After querying defendant, the court accepted the jury waiver. The record contains a written waiver for No. 15-DT-2963. There is no waiver in the record for No. 15 DT 99963.

¶ 11   After disposing of some housekeeping matters, the court had this discussion with the parties as to which case was ready for trial:

          "THE COURT: *** Are we trying the TR case [(No. 15-TR-99963)] and the DT

     case [(No. 15-DT-2963)] at the same time or are they two separate cases?

MS. MONDRY [(DEFENSE ATTORNEY)]: Judge, it arises out of the same course of conduct. I mean it doesn't matter to us what the State wants to do. If they are not prepared to go on the traffic case [(No. 15-TR-99963)] we can deal with that.

THE COURT: The DT alleges disobeying traffic control device, driving too fast for conditions. They both have failure to reduce speed to avoid accident tickets. One of them. They are different tickets though.

MS. MONDRY: Yes.

THE COURT: *** [T]he DT file *** alleges *** 2:15 p.m. and then the other one alleges *** 13:59 p.m. which I suppose by my calculation is 15 minutes earlier. So, are we just going to trial on the DT?

MS. CIESIELSKI [(ASSISTANT STATE'S ATTORNEY)]: Judge, I think just the DT. My impression was this one [(No. 15-TR-99963)] was tracking for status.

THE COURT: Okay.

MS. CIESIELSKI: So we are not ready on that one.

THE COURT: This is why I ask those questions before trial."

¶ 12    The court proceeded to remark that it would defer ruling on defendant's motion *in limine* to exclude the urine-test results. The court would wait until the results were offered at trial and then determine if the State had laid a proper foundation.

¶ 13    The bench trial ensued. The State called Warrenville police officer Brian Feiler. He testified that, around 2:15 p.m. on November 3, 2015, he was dispatched to the intersection of Winfield Road and Interstate 88. Asked the reason for the dispatch, Feiler answered that "[w]hat started as a simple motorist assist turned into a hit and run investigation," which "later turned into an investigation regarding DUI." Feiler proceeded to a parking lot on Torch Parkway near

the intersection of Winfield Road and Interstate 88. Feiler met there with fellow officers and observed a pickup truck and a Jeep parked in the lot. Feiler spoke with defendant, who was in the driver's seat of the Jeep. Feiler observed that defendant had bloodshot, glassy eyes. Feiler also detected the slight odor of an alcoholic beverage on defendant's breath. Defendant seemed confused to Feiler, because of his "hesitation to answer one of [Feiler's] questions," but Feiler did not actually need to repeat those questions. Feiler did not notice any slurring in defendant's speech or anything unusual about his facial expressions. Defendant was wearing what appeared to be safety glasses.

¶ 14    Defendant told Feiler that he had come from Naperville and was on his way back to work. Feiler "asked [defendant] about the crash and how he ended up at Torch Parkway." Defendant replied that, after the accident, he and the other driver agreed to meet at another location to exchange information. Feiler queried defendant about his alcohol consumption, and defendant claimed to have drunk one beer. Feiler also asked defendant how the accident occurred. Defendant claimed that he "attempted to stop *** at this busy intersection." Feiler observed that the pickup truck had damage to the driver's side, which was consistent with defendant's admission that he had failed to stop. Feiler acknowledged at trial that the intersection where the accident occurred was indeed a very busy intersection.

¶ 15    Feiler testified that he also spoke with defendant "in regards to an accident that had occurred in Naperville that same date." Defendant claimed of this accident, too, that he had "attempted to stop."

¶ 16    Feiler asked defendant to undertake field sobriety tests, and he agreed. Defendant had no difficulty exiting the Jeep, and Feiler noticed nothing unusual about defendant's gait as he walked to the area where he would take the tests. Feiler admitted that, contrary to National

Highway Traffic Safety Administration standards, he failed to ask defendant prior to the tests whether he had any injuries or used corrective lenses. The first test that Feiler administered was the horizontal gaze nystagmus (HGN) test. Defendant stood perfectly still during the test and did not sway. During the test, defendant exhibited four out of six indicators that he was under the influence of alcohol. Specifically, defendant exhibited, in both eyes, a "lack of smooth pursuit" and "distinct and sustained nystagmus at maximum deviation." According to Feiler, defendant failed the HGN test.

¶ 17    Next, Feiler instructed defendant how to perform the walk-and-turn test. In taking the test, defendant exhibited seven indicators that he was under the influence of alcohol. For instance, defendant was unable to remain in the start position, he began the test before the instructions were finished, he failed to touch heel to toe, and he stepped off the line. Feiler explained that a subject fails the test when he shows at least two indicators.

¶ 18    Feiler next had defendant perform the one-leg-stand test. As Feiler was explaining how to perform the test, defendant began moving like he was performing the walk-and-turn test again. Feiler corrected defendant, but he eventually terminated the test when it appeared that defendant would not perform the test.

¶ 19    Feiler testified that he also asked defendant to recite the alphabet from J to W without singing it. Defendant performed this test successfully.

¶ 20    Based on defendant's overall performance on the field sobriety tests, Feiler arrested him for driving under the influence of alcohol. Feiler acknowledged that the tests he administered were "mostly tests for alcohol," not drugs. Feiler also recognized that there can be "innocent reasons" why one would fail such tests. In addition to arresting him for DUI, Feiler issued defendant a citation for driving too fast for conditions.

¶ 21    The State introduced into evidence the dashboard-camera footage of defendant's interaction with Feiler at the scene, including the field sobriety tests. The footage is consistent with Feiler's testimony. Defendant appears disoriented; he haltingly answers basic questions such as where he was coming from and where he works. He is unable to perform the walk-and-turn test, throwing his arms out wildly to keep from stumbling. When Feiler states the instructions for the one-leg-stand test, defendant begins repeating the instructions for the walk-and-turn test. Defendant persists in this despite Feiler's repeated attempts to correct him. Feiler then terminates the test.

¶ 22    Feiler testified that he transported defendant to the police station for booking. At 3:40 p.m., Feiler gave defendant the *Miranda* warnings (see *Miranda v. Arizona*, 384 U.S. 436 (1966)) and asked him about his prior activities that day. Defendant stated that he had been trying to get his phone fixed and had consumed two beers in his car. Feiler administered a breath test to confirm whether defendant was under the influence of alcohol. The test revealed a blood alcohol concentration (BAC) of 0.00. Suspecting that defendant was under the influence of some other substance, Feiler asked him to submit blood and urine samples. Defendant agreed to provide a urine sample. Before defendant provided the urine sample, Feiler asked for assistance from Carol Stream police officer Hillary Mabbitt. When Mabbitt arrived, she administered further sobriety tests. Feiler noted that, at some point during booking, defendant urinated in his pants while in his holding cell even though the cell had a toilet. Feiler described defendant as having been polite and cooperative throughout their interaction on November 3, 2015.

¶ 23    Feiler testified regarding his collection of the urine sample from defendant. Feiler obtained a plastic specimen container from the evidence room. The container was clean, dry, and sealed. Feiler broke the seal to open the container. Accompanied by Officer Joshua Perry,

Feiler went to defendant's cell. Feiler put on latex gloves and opened an antibacterial swab. At Feiler's instruction, defendant wiped the tip of his penis with the swab, urinated into the toilet for several seconds, and then urinated into the container. Retrieving the container from defendant, Feiler screwed on the top, affixed evidence tape over the top, and placed identifying marks on the container. He then placed the container into an evidence locker and locked the door. He also prepared an evidence form.

¶ 24    Feiler was shown State's exhibit 5, which he identified by its markings as the container in which defendant's urine sample was collected on November 3, 2015. Feiler had not seen the container since placing it into the evidence locker on November 3.

¶ 25    Feiler testified that he received a phone call from Brian Bessey on November 10, 2015, seven days after defendant's arrest. Following their conversation, Bessey forwarded to Feiler a voice mail. Feiler listened to the voice mail and recognized defendant as the speaker.

¶ 26    Bessey testified that he owned a Batteries Plus franchise. On November 10, 2015, he received a voice mail from a prior customer. Based on the content of the voice mail, he called the Naperville Police Department and eventually came into contact with Feiler.

¶ 27    The State introduced into evidence the voice mail that Bessey had received and forwarded to Feiler. The speaker in the voice mail identifies himself as "Dr. Larry Lenz," who works in Naperville. The speaker narrates his two traffic accidents and subsequent arrest. He states that he was driving in Naperville when he "tapped" a car. He kept driving because he "had patients." Later, he entered an intersection near his office just as the light was turning red. He "slid and ran into a Ford F-150," "T-bon[ing] it." He and the other driver pulled into a parking lot. The police arrived and asked what he had been drinking. They claimed to smell alcohol on

his breath and ordered him out of the car. He "did all the walks," but the police "didn't like the walks and they arrested [him]."

¶ 28    Perry testified that, on November 3, 2015, he was dispatched to the area of Winfield Road and Interstate 88 in relation to a hit-and-run. When he arrived, Perry saw defendant and his Jeep Wrangler as well as another individual and his F-150 pickup truck. There was damage to the front driver's-side bumper of the Jeep and to the driver's side of the F-150.

¶ 29    Perry testified that he searched defendant's Jeep following his arrest and recovered four beer bottles. Later, at the police station, Perry was conducting a routine check of persons in custody when he observed that the crotch area of defendant's pants was wet. Defendant's cell was equipped with a toilet.

¶ 30    Perry testified that he was with Feiler when defendant provided the urine sample. Perry testified to the precautions taken in collecting the urine sample: the specimen cup was clean and dry and had an unbroken seal, latex gloves were used in collecting the sample, Perry and Feiler observed defendant as he urinated into the cup, and afterward the lid of the cup was tightened and sealed. Perry identified his signature and badge number on State's exhibit 5.

¶ 31    The State's next witness was Christine Cava, a forensic scientist with the Illinois State Police crime lab. Cava identified State's exhibit 5 as a specimen container that the lab received on November 10, 2015. When Cava received the container, it was inside a bag. Both the container and the bag were sealed. Cava identified a "toxicology evidence worksheet" associated with the container. An evidence technician who previously handled the container had noted on the worksheet that (1) a "small" amount of urine had leaked from the container into the original evidence bag, which was then replaced and (2) the top red layer of the evidence tape across the lid of the container was loosely attached to the adhesive clear side of the tape, but "the

clear adhesive tape was still in tact [*sic*]." Cava testified that the leak could not have affected her testing, because "[e]verything was sealed up and in tact [*sic*]" and there was no evidence of contamination.

¶ 32    Cava testified that she performed preliminary and confirmatory tests on the urine sample. She tested only for tetrahydrocannibinol (THC) metabolite and cocaine metabolite. The sample was positive for THC metabolite and negative for cocaine metabolite. Cava tested for merely the presence, not the quantity, of THC metabolite; thus, she could not testify to whether defendant was impaired from the presence of the drug in his system. She further conceded that she could not "pin point [*sic*] a time" when defendant consumed the cannabis. He might have consumed the cannabis weeks or months before the sample was collected. Cava agreed that a positive blood test "would be more indicative of recent use" of THC than a urine test.

¶ 33    Following Cava's testimony, the parties agreed with the court to continue the trial to October 27, 2017. The trial court entered contrasting orders in Nos. 15-TR-99963 and 15-DT-2963. The court continued No. 15-TR-99963 to October 27 for "tracking." The court continued No. 15-DT-2963 to October 27 for a bench trial.

¶ 34    When the trial resumed on October 27, the State called Mabbitt, its fourth and final witness. The parties stipulated that Mabbitt was a drug-recognition expert and was certified under the National Drug Evaluation and Classification Program (DRE program). Mabbitt testified that the DRE program was created by the National Highway Traffic Safety Administration and is "a post[-]arrest procedure to help officers who encounter people on the street who appear impaired and that impairment is not caused by alcohol." The DRE program is a "12-step process to determine if the person is under the influence of drugs, whether there is a medical condition, or the person is not impaired." According to Mabbitt, there are seven classes

of drugs: central nervous system depressants, central nervous system stimulants, hallucinogens, dissociative anesthetics, narcotic analgesics, inhalants, and cannabis. The DRE program is designed to identify the class(es) of drugs, if any, of which the subject is under the influence.

¶ 35    Mabbitt testified that, on November 3, 2015, she was summoned to the Warrenville Police Department. She arrived at 6:20 p.m. and immediately began a DRE program evaluation of defendant. Mabbitt stated that the first step of such an evaluation is a breath test. In this case, Mabbitt determined, based on the breath test previously administered by Feiler, that defendant could not have been under the influence of alcohol.

¶ 36    The second step of the evaluation was to consult with Feiler, the arresting officer. Over defendant's objection, Mabbitt testified that she learned from Feiler that defendant was involved in a traffic accident in Warrenville and possibly was also involved in a prior hit-and-run incident in Naperville in which he struck a parked car. Feiler further advised Mabbitt that defendant failed field sobriety tests.

¶ 37    Mabbitt testified that, for the third step of the evaluation, she met defendant and observed his physical condition. Mabbitt smelled urine and noticed that the front of defendant's pants was wet. Defendant said that he had urinated on himself because he was cold. Mabbitt noted that defendant's cell was equipped with a toilet.

¶ 38    Mabbitt made further observations of defendant. His eyes were bloodshot and watery and his conjunctivas were reddened. The muscles in his face were relaxed and even "droopy." His speech was slow and raspy. His movements, too, were slow and his coordination was poor; he would hold onto the walls for balance. At one point, defendant had to be told to stop walking around. Mucus was dripping from defendant's nose. When Mabbitt asked defendant if he was

aware of it, he said no. Overall, according to Mabbitt, defendant "didn't really have many reactions."

¶ 39 On further questioning about her observations, Mabbitt admitted that she did not ask defendant why he appeared and acted in the ways that she had found noteworthy (bloodshot and watery eyes, slow movements, etc.). She also recognized that one can have bloodshot and watery eyes and poor coordination without being under the influence of drugs. Moreover, having not met defendant before, Mabbitt was unable to say whether his face was normally droopy.

¶ 40 During this third step of the evaluation, Mabbitt took the first of three pulse checks throughout the evaluation. Defendant's pulse was 80, which is on the higher end of the normal range (60 to 80).

¶ 41 Mabbitt continued step three by asking defendant a prescribed series of questions. Defendant answered that he had slept for 10 hours the night before, he was not sick, injured, diabetic, epileptic, currently under the care of a doctor, or taking medication, and his only "physical defect" was a broken wrist suffered a year ago. Based on her observations and defendant's answers, Mabbitt believed that defendant was not suffering from a medical condition and that she should continue the evaluation.

¶ 42 The next step of the assessment was an eye examination. Mabbitt administered the HGN test. Mabbitt found all six indicators of nystagmus. Defendant had onset of nystagmus at 30 degrees, which is almost immediate, indicting a high level of impairment. Defendant also exhibited vertical gaze nystagmus (VGN), which indicated that he was under a "high dosage" of either alcohol, central nervous system depressants, inhalants, or dissociative anesthetics. Next, Mabbitt administered the convergence test, which measures the subject's ability to track with his

eyes. Defendant was unable to track, which indicated "an issue with the muscle movement of the eyes *** , possibly caused by drugs."

¶ 43    For the fifth step of the assessment, Mabbitt administered several psychophysical tests. The first was the Modified Romberg Test, which requires the subject to stand in place with his feet together, close his eyes, and tilt his head back. The subject is to hold that position for 30 seconds, keeping time silently. Defendant swayed in place and was unable to keep his feet together. He showed a visible throat tremor. Also, what defendant counted as 30 seconds was actually 75 seconds. This showed a "slow internal clock."

¶ 44    The next test was the walk-and-turn test. Defendant had "extreme difficulty" maintaining the starting position with the heel of one foot touching the toes of the other. He had to place his hand on the wall multiple times to steady himself. As he walked, he was off-balance and raised his arms multiple times. He missed heel-to-toe three or four times and took more steps than instructed.

¶ 45    Mabbitt next had defendant take the one-leg-stand test. He showed all four indicators of impairment: he swayed, hopped, used his arms for balance, and failed to keep his foot off the ground. Finally, Mabbitt administered the finger-to-nose test. On five of six attempts, defendant "double-tapped," *i.e.*, touched somewhere else on his nose before touching the tip.

¶ 46    In Mabbitt's view, defendant showed signs of impairment on each of the four psychophysical tests.

¶ 47    For the sixth step of the evaluation, Mabbitt took defendant's pulse for the second time as well as his blood pressure and temperature. Defendant's pulse was 82, again on the higher end of normal. His blood pressure was 163 over 89, which is slightly elevated. His temperature was normal.

¶ 48    For the seventh step, Mabbitt began by checking the size of defendant's pupils in light and dark conditions. His pupil size was on the low end of normal. His pupils were also very slow to react to light. During the pupil check, Mabbitt noted again that defendant's eyelids were droopy.

¶ 49    Mabbitt also conducted nasal and oral examinations. There was a significant amount of mucus in both nostrils, and the left nostril was inflamed. Mabbitt also observed a white paste on defendant's tongue.

¶ 50    The eighth step was a check of defendant's muscle tone, because "[c]ertain categories of drugs can cause a person to either have normal muscle tone, flaccid muscle tone, or rigid muscle tone." Mabbitt instructed defendant to make a fist so she could observe whether there was a change in the tone of his bicep. Defendant "could not really make a fist" and exhibited flaccid muscle tone. This was a possible indicator of "certain drug categories being in [his] system." Mabbitt acknowledged, however, that a person can have flaccid muscles in the absence of drugs.

¶ 51    Mabbitt began the ninth step with another pulse check. Defendant's pulse was 80. Mabbitt looked for injection marks on defendant's hands, arms, and ankles but found none.

¶ 52    For the tenth step, Mabbitt asked defendant questions to determine what type of drug he might have used. Defendant admitted that he had drunk two beers, the last of which at 5:50 p.m.[1] Defendant told Mabbitt that he did not believe that he was under the influence of alcohol. Mabbitt also asked defendant whether he had driven a vehicle that day. Over defendant's objection, Mabbitt testified that she and defendant "talked about the crashes that he had been in and in regards to the hit and run crash in Naperville." Defendant claimed that the vehicle he struck "had come out of nowhere," but Mabbitt later learned that it was a parked vehicle.

_____

[1] Notably, defendant was in police custody since midafternoon.

Mabbitt commented that defendant seemed "unconcerned" with respect to the two accidents in which he was involved. Mabbitt admitted that she did not question defendant about his apparent lack of concern.

¶ 53    For the eleventh step, Mabbitt applied the accumulated data against the drug matrix that includes all seven drug categories. The aim was to determine whether defendant was under the influence of a drug and, if so, which category, or categories, was involved.

¶ 54    Mabbitt concluded from the data that defendant was "very impaired" and in no condition to operate a motor vehicle safely. She opined that defendant was under the influence of a combination of central nervous system depressants and narcotic analgesics. Mabbitt explained that central nervous system depressants include antidepressants and muscle relaxants. Xanax is an example of a central nervous system depressant. Narcotic analgesics are generally opiate-based. Vicodin is an example.

¶ 55    Mabbitt stated that defendant exhibited the following indicators that he was under the influence of either central nervous system depressants or narcotic analgesics: HGN and VGN, lack of convergence, slow and deliberate movements, slow and raspy speech, complaint of coldness, lack of awareness of his surroundings (urinating in his pants despite the availability of a toilet), white paste on his tongue, and his pupils' slow reaction to light. Mabbitt linked specific symptoms to one class of drugs or the other. For instance, defendant's report that he was cold was consistent with narcotic analgesics because such drugs "slow down *** [the] system so it makes [the] body temperature lower." Also indicative of narcotic analgesics were defendant's slow movements and speech and his pupils' slow reaction to light. Mabbitt further noted that drunken behavior in the absence of detectable alcohol in one's system is a general indicator of a central nervous system depressant.

¶ 56 As for the white paste on defendant's tongue, Mabbitt believed that, given the other indicators of drug use, the paste was likely left by something defendant had smoked. She admitted, however, that she did not detect an odor of burnt marijuana on defendant. She also acknowledged that white paste can develop on one's tongue in the absence of drugs.

¶ 57 Mabbitt noted that some of defendant's symptoms were consistent with one class of drugs but not the other. For instance, the presence of HGN and VGN, and the lack of convergence, were symptoms of central nervous system depressants but not narcotic analgesics. The range of symptoms indicated to Mabbitt "that there was actually more than one drug category that was at work [in defendant] on that day."

¶ 58 Mabbitt explained that the twelfth step of the evaluation was a request for a blood or urine sample. Defendant agreed to provide a urine sample. Mabbitt left the police station before defendant provided the sample. Mabbitt was aware that the sample was not tested for central nervous system depressants or narcotic analgesics. Hence, the urine test did not provide "affirmative evidence confirming [her] opinion." Mabbitt noted that cannabis is a category of drug separate from central nervous system depressants and narcotic analgesics. Mabbitt detected no sign that defendant had been smoking marijuana. She "did not feel that [defendant] was under the influence of cannabis."

¶ 59 The State introduced footage from the security camera in the booking room of the Warrenville police station. The video resolution is poor and there is no audio. Mabbitt and defendant are off-camera during a significant portion of the evaluation. The footage does, however, show defendant's attempts at the walk-and-turn and one-leg-stand tests, and it supports Mabbitt's assessment that defendant performed poorly on both. Defendant appears to have as

much difficulty with the walk-and-turn as he did when Feiler administered it approximately four hours before. Defendant shows a similar lack of balance on the one-leg-stand test.

¶ 60     At the close of its case, the State moved for admission of State's exhibit 5, the specimen container. Defendant objected, arguing, *inter alia*, that the State failed to establish that the leak that Cava identified in her testimony did not result in contamination of the urine sample. The trial court overruled the objection. First, the court held that the leak did not call into question the reliability of the test results:

> "Logically, if there was a leak in that container and some of the leak was in the bag, that tells me that the bag contained the leak. I'm not saying it's a good thing that the container leaked, but that's why they have a bag. It's an additional level of care. It's an additional level of keeping contaminants out, any potential shenanigans, and I don't know why anybody would go into the Illinois State—would break into law enforcement and mess with a sample. But the bag contained the leak which I think *** preserved the sample. It makes me confident that the result is reliable."

The court's "backup position" was that there was substantial compliance with the urine collection standards in section 1286.330 of Title 20 and that, therefore, the test results were admissible. See *People v. Bishop*, 354 Ill. App. 3d 549, 556 (2004) ("[S]trict compliance is not required for admissibility of chemical test results under section 1286.330(d) of the Illinois Administrative Code; rather, substantial compliance is sufficient.").

¶ 61     After the State rested, the trial court heard and denied defendant's motion for a directed finding. The defense presented no witnesses.

¶ 62    The trial court found defendant guilty on all three counts in No. 15-TR-99963, which concerned the Naperville incident.  Defendant did not object when the court entered its findings on those counts

¶ 63    The court proceeded to No. 15-DT-2963, which concerned the Warrenville incident. The court first found defendant guilty on counts II and III, which charged, respectively, disobeying a traffic-control device and failing to reduce speed to avoid an accident.

¶ 64    Turning to the two DUI counts, the court found defendant guilty on count IV, which the court commented was "the easier" count to prove, because it required the presence, in any amount, of cannabis in defendant's system resulting from unlawful use.  See 625 ILCS 5/11-501(a)(6) (West 2014).

¶ 65    "[A] lot harder" for the court was count I, which alleged that defendant was under the influence of a drug or combination of drugs that made him incapable of driving safely.  See *id.* § 11-501(a)(4).  The court noted that Mabbitt was "combative" toward defense counsel and that, "quite frankly, it goes to [her] credibility."  The court proceeded to characterize Mabbitt as "combative but knowledgeable."  In fact, she was "extremely knowledgeable, extremely aware." The court was "hesitant," from a "non expert's" perspective, to believe that defendant had cannabis plus two other substances—a depressant and a narcotic—in his system at once. Nonetheless, the court accepted Mabbitt's conclusions, finding them corroborated by two sources:  (1) "the fact that the defendant was not able to exercise ordinary care [in] that he got in two car accidents in a relatively short amount of time" and (2) the video footage showing defendant failing sobriety tests and "struggling with a lot of very basic motor function skills" both at the arrest scene and later at the police station.

¶ 66    Defendant filed a posttrial motion. The following is the entirety of its substantive portion:

"1. The State failed to prove the Defendant guilty of the charges beyond a reasonable doubt.

2. The finding is against the weight of the evidence.

3. The Defendant was denied due process of law.

4. The Defendant was denied equal protection of the laws.

5. The State failed to prove every material allegation of the offenses beyond a reasonable doubt including the necessary element of jurisdiction.

6. The Court erred in denying the Defendant's Motion For a Directed Finding.

7. The Defendant did not receive a fair and impartial trial as guaranteed him under Article I, sections 2, 6, 8 and 10 of the Constitution of the State of Illinois and under the Fourteenth Amendment of the Constitution of the United States."

¶ 67    At the hearing on the posttrial motion, defense counsel stated that she was "resurrecting the same arguments that [she] made *** during the trial and focusing now, as [she] did [at] the trial, on the admission of the urine sample and the fact that *** there was never any testimony by anyone that there was cannabis in [defendant's] system at the time he was driving." Defendant referred the court to the written motion for additional points.

¶ 68    The trial court denied the motion and proceeded to sentencing. The court imposed sentence first on No. 15-DT-2963. The court merged count IV into count I. The court sentenced defendant on count I to 2 years of probation and 240 hours of community service. On counts II and III, the court ordered supervision but terminated it *instanter*.

¶ 69    On No. 15-TR-99963, the court merged count III (failure to provide information following an accident) into count I (leaving the scene of an accident). The court then imposed fines on counts I and II (failure to reduce speed).

¶ 70    Defendant's appeal in No. 15-DT-2963 was docketed as No. 2-18-0124, and his appeal in No. 15-TR-99963 was docketed as No. 2-18-0125. We granted defendant's motion to consolidate the appeals.

¶ 71                                    II. ANALYSIS

¶ 72                        A. Convictions in No. 15-TR-99963

¶ 73    Defendant asks us to vacate his convictions in No. 15-TR-99963 (the Naperville incident) because that case was set for status, not trial, on September 27, 2017, when the trial began on No. 15-DT-2963. The State concedes that the convictions must be vacated, and we accept the concession. A fundamental component of due process is that a defendant cannot be convicted without notice and a meaningful opportunity to defend. *Jackson v. Virginia*, 443 U.S. 307, 314 (1979). The record suggests that, between September 27 and the second day of trial, October 27, 2017, the trial court simply overlooked that No. 15-TR-99963 was not being tried but had been carried over for status to October 27. The court's oversight was perhaps understandable given that the State's evidence in No. 15-DT-2963 referenced the Naperville incident. Regardless, however, of why the court acted as it did, the adjudication of No. 15-TR-99963 was a violation of due process, as defendant lacked notice and a meaningful opportunity to present a defense. Therefore, we vacate the convictions in No. 15-TR-99963.

¶ 74    The parties addressed for the first time at oral argument whether jeopardy attached to defendant's convictions in No. 15-TR-99963. We agree with the State that jeopardy did not attach. The fifth amendment to the United States Constitution and article I, section 10, of the

Illinois Constitution provide that no person shall be twice placed in jeopardy for the same offense. U.S. Const., amend. V; Ill. Const. 1970, art. I, § 10. "The traditional rule is that jeopardy attaches in a bench trial when the first witness is sworn and the court begins to hear evidence." *People v. Deems*, 81 Ill. 2d 384, 389 (1980). The State's evidence presented on September 27 and October 27 referred only obliquely to the Naperville incident. This was consistent with the parties' understanding that No. 15-TR-99963 was not set for trial on those dates. Moreover, since the case was not set for trial, the trial court could not properly adjudicate the charges (as explained above). Under these circumstances, jeopardy did not attach. See *People v. Tellez-Valencia*, 295 Ill. App. 3d 122, 128 (1998) (jeopardy did not attach where the statute under which the defendant was charged was void *ab initio*).

¶ 75    Defense counsel contended at oral argument that jeopardy attached because defendant completed his sentences on the convictions in No. 15-TR-99963. We disagree. As we have explained, jeopardy did not attach to the *convictions* in No. 15-TR-99963. The State might wish to secure proper convictions in No. 15-TR-99963, even though defendant has already been punished in relation to that case and cannot be further sentenced on it because of the bar against multiple punishments for the same offense (see *People v. Cervantes*, 2013 IL App (2d) 110191, ¶ 24). The double-jeopardy rule does not prevent the State from seeking bare convictions on remand.

¶ 76    For these reasons, we vacate defendant's convictions in No. 15-TR-99963 and remand the cause for further proceedings.

¶ 77                    B. Evidence Regarding the Naperville Incident

¶ 78    Defendant argues that we must not only vacate his convictions in No. 15-TR-99963 but also reverse his convictions in No. 15-DT-2963, because they were tainted with inadmissible testimony regarding the Naperville incident.

¶ 79    The State contends that defendant forfeited this issue by failing to object at trial and specifically include the contention in a posttrial motion. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (to preserve an issue for appeal, the defendant must raise it both at trial and in a written posttrial motion). We hold that, regardless of whether defendant made proper objections, he did not properly preserve his claim of error in a posttrial motion. Defendant submits that he preserved the claim by asserting in his posttrial motion that he was "denied due process of law." We disagree. Such vague and general claims are insufficient to avoid forfeiture. See *People v. Morgan*, 142 Ill. 2d 410, 445 (1991) ("merely vague, general allegations of error" in a posttrial motion are insufficient to preserve a claim for appeal), *rev'd on other grounds sub nom. Morgan v. Illinois*, 504 U.S. 719 (1992); *People v. Hampton*, 307 Ill. App. 3d 464, 475 (1999). "The failure to specifically raise an alleged error in a written posttrial motion results in the waiver of the issue, as general allegations of error do not alert the trial court to alleged errors that can be corrected at the trial court level." *People v. Henry*, 318 Ill. App. 3d 83, 85 (2001).

¶ 80    The plain-error doctrine allows a reviewing court, in certain circumstances, to relax the forfeiture rule and reach the merits of a claim. See *People v. Sebby*, 2017 IL 119445, ¶ 48. The defendant bears the burden of showing that his case meets the requirements of the doctrine. *People v. Hillier*, 237 Ill. 2d 539, 545 (2010). The defendant obviously cannot satisfy that burden if he does not even invoke the doctrine. *Id.* Remarkably, even in the face of the State's forfeiture argument, defendant does not argue for plain-error review of whether the trial court

erroneously admitted testimony regarding the Naperville incident. Consequently, the forfeiture stands.

¶ 81                                    C. Admission of the Urine Test Results

¶ 82    Defendant contends that the trial court erred in admitting the results of his urine test. Though a forfeiture argument might well have had merit here also, the State does not make that argument. Consequently, we consider the merits of defendant's contention. See *People v. Higgins*, 2014 IL App (2d) 120888, ¶ 15 (declining to find the defendant's argument forfeited, because the State did not argue forfeiture).

¶ 83    The parties disagree over the standard of review. Defendant recognizes that, generally, rulings on the admissibility of evidence are reviewed for an abuse of discretion (see *People v. Starks*, 2012 IL App (2d) 110273, ¶ 20), but he argues for *de novo* review because, as he frames it, his argument involves the interpretation of an administrative regulation, namely section 1286.330. We agree with defendant. In *People v. Hall*, 2011 IL App (2d) 100262, ¶ 10, and *People v. Ebert*, 401 Ill. App. 3d 958, 960-61 (2010), we reviewed *de novo* whether a court may accept substantial compliance with certain requirements in the Administrative Code for the collection of samples for alcohol and drug testing. The issue here is whether the trial court erred in applying a substantial-compliance standard to another requirement of the Administrative Code governing the collection of samples. Under *Hall* and *Ebert*, we apply the *de novo* standard.

¶ 84    Section 11-501.2(a) of the Vehicle Code (625 ILCS 5/11-501.2(a) (West 2014)) provides that chemical analyses of a person's urine are admissible in a DUI prosecution brought under section 11-501 of the Vehicle Code. Section 11-501.2(a)(1) (*id.* § 11-501.2(a)(1)) places the following condition on admissibility: "Chemical analyses of the person's blood, urine, breath, or other bodily substance to be considered valid under the provisions of this Section shall have been

performed according to standards promulgated by the Department of State Police ***." Section 1286.330 of Title 20 of the Administrative Code (20 Ill. Adm. Code 1286.330 (2007)) was promulgated under section 11-501.2(a)(1) of the Vehicle Code. Section 1286.330 prescribes the process for collecting urine samples for testing. The section states in its entirety:

"UAC [(urine alcohol concentration)] testing is not a preferred method of determining the amount of alcohol in a subject and the feasibility of other testing procedures should be explored before deciding UAC testing for alcohol concentration. Urine is the preferred method for drug confirmation. The following procedures shall be used to obtain a urine sample from a subject to determine the presence of alcohol, other drugs or intoxicating compounds:

a) A sample of urine shall be collected in a manner to preserve the dignity of the individual and to ensure the integrity of the sample.

b) A urine sample may be collected by the arresting officer, another law enforcement officer, an agency employee, or a hospital nurse who can authenticate the sample. The officer, agency employee, or nurse shall be of the same sex as the subject undergoing testing.

c) A urine sample of approximately 60 ml should be collected.

d) Urine sample[s] shall be collected in clean, dry containers.

e) No preservatives shall be used. The containers shall be closed.

f) The containers shall be labeled with the name of the subject and the date of the collection.

g) The urine samples shall be delivered as soon as practicable to a laboratory certified by the Department.

h) The testing laboratory shall maintain any remaining sample for a period of six months after testing unless otherwise directed by the submitting agency or the appropriate prosecuting authority." *Id.*

¶ 85    The results of a chemical test are inadmissible in a DUI prosecution if the collection and testing of the sample did not comply with section 11-501.2 of the Vehicle Code and the regulations promulgated under its authority. *Hall*, 2011 IL App (2d) 100262, ¶ 11. Substantial compliance with the collection and testing standards is acceptable unless the process of judging the degree of compliance requires the court to venture into an area beyond its expertise. *Ebert*, 401 Ill. App. 3d at 965. We said in *Ebert*:

"[O]ur General Assembly has delegated to the Department [of State Police] the responsibility for formulating standards for blood, breath, and urine testing. The standards exist not for their own sakes, but in service of the truth-seeking function, which they promote by ensuring that blood, breath, and urine tests are conducted in a manner that produces reliable results. If the standards are to serve this purpose, the rule of substantial compliance must be one that neither blithely ignores the standards nor enforces them in a purely rote manner. We are therefore reluctant to relax the standards when doing so would require inquiry into the scientific basis for a particular standard. However, when it is clear that a particular deviation from the mandated procedures does not pertain to a matter of science, a court is perfectly competent to determine whether, in a given case, the deviation compromised the integrity of the testing process." *Id.*

¶ 86    If substantial compliance is the appropriate standard under the circumstances, then a deviation from section 11-501.2 and associated regulations will disqualify test results from

admission only if the deviation renders the results unreliable or prejudices the defendant. *Bishop*, 354 Ill. App. 3d at 556.

¶ 87 Defendant argues that the urine-test results were inadmissible based on the evidence worksheet's notations that (1) a small amount of urine had leaked from the container into the original evidence bag, which was then replaced, and (2) the top red layer of the evidence tape across the lid of the container was loosely attached to the clear adhesive clear side of the tape, but "the clear adhesive tape was still in tact [*sic*]." These were deviations, claims defendant, from two requirements of section 1286.330: "urine sample[s] shall be collected in clean, dry containers" and "[t]he containers shall be closed" (20 Ill. Adm. Code 1286.330(d), (e) (2007)). According to defendant, the urine that leaked from the container might have come into contact with outside contaminants before seeping back into the container. Such contaminants, defendant proposes, might have been on the outside surface of the cup, which was handled by defendant and the officers, or inside the original or replacement evidence bag.

¶ 88 We must first determine whether we are competent to gauge substantial compliance in this instance without inquiring into the scientific bases for the standards that defendant claims were infringed. Our decision in *Hall* is an example—in fact, the only published example we have found in Illinois—of a reviewing court finding that it lacked the competency to determine substantial compliance with a standard governing chemical tests. The defendant in *Hall* challenged the results of his blood test on the ground that the sample was not treated with a preservative, contrary to section 1286.320(d) of Title 20 of the Administrative Code (20 Ill. Adm. Code 1286.320(d), amended at 31 Ill. Reg. 15107 (eff. Oct. 29, 2007)), and was not tested for almost three weeks after it was drawn. At the hearing on the defendant's motion to exclude the test results, a State toxicologist testified that it was not unusual to perform a BAC test on a

blood sample that was 18 or 19 days old. The defendant called an expert witness who claimed that it was probable that microbial growth due to a lack of preservative in a blood sample would lead to the synthesis of alcohol and, hence, a false positive. *Hall*, 2011 IL App (2d) 100262, ¶ 12. The trial court barred the test results, and this court affirmed. We applied a strict-compliance standard because we found that we lacked the expertise to judge substantial compliance with the preservative requirement:

> "[T]he issue of whether the failure to include preservative in the tube of blood used for defendant's BAC test requires an inquiry into the scientific basis for the requirement. The blood was not tested for almost three weeks after it was drawn; neither the trial court nor this court is 'perfectly competent,' in the words of *Ebert*, to determine whether the failure to include the preservative compromised the integrity of the testing process. [Citation.] The legislature has assigned to the Department of State Police the responsibility to promulgate standards for chemical analyses of blood, urine, and breath and to 'prescribe regulations as necessary to implement' section 11-501.2. 625 ILCS 5/11-501.2(a)(1) (West 2006). We will not second-guess the reasoning behind these regulations by considering conflicting testimony regarding scientific matters that are within the purview of the Department of State Police. We cannot conclude that failure to strictly comply with subsection (d) is *de minimis*." *Id.* ¶ 16.

¶ 89 Defendant's argument here is layered speculation: he speculates that there was a contaminant on the outside of the container or in the bags, he further speculates that the leaked urine was impacted by the contaminant, and finally he speculates that the urine seeped back into the container. Defendant does not acknowledge it, but the contaminant he conjectures is not a

leaf of marijuana or even a pure suspension of THC, but actually someone else's metabolized THC, coming from, presumably, another urine sample in storage.

¶ 90    In *Hall*, there was an expert opinion that the mere lack of preservative could trigger a chemical process leading to false positives. Here, by contrast, defendant's contamination theory is premised on an outside agent whose existence he can only conjecture. Thus, his theory remains outside the realm of science. Also of importance is that we expressly relied in *Hall* on the presence of conflicting testimony that implicated the science behind the preservative requirement. Here, defendant left entirely unrebutted Cava's testimony that there was no evidence that defendant's urine sample was contaminated. Under these circumstances, we apply the substantial-compliance standard.

¶ 91    Our analysis under that standard is straightforward. As defendant failed to rebut Cava's critical testimony that there was no evidence of contamination, we must conclude that the leak of the urine sample neither prejudiced defendant nor rendered the results of the urine test unreliable.

¶ 92                 D. Sufficiency of the Evidence in No. 15-DT-2963

¶ 93    Defendant challenges the sufficiency of the evidence in support of his convictions in No. 15-DT-2963.

¶ 94                        1. Petty Traffic Offenses

¶ 95    The trial court found defendant guilty of count II, disobeying a traffic-control device (625 ILCS 5/11-305(a) (West 2014)), and count III, failing to reduce speed to avoid an accident (*id.* § 11-601(a)). Defendant claims that these convictions were improper because "there was evidence that a collision occurred, but no evidence outside of the defendant's statements to show that the *** offenses occurred." Defendant concedes that he made out-of-court statements about the Warrenville incident and that those statements were properly admitted (see Ill. R. Evid.

801(d)(2) (eff. Oct. 15, 2015). He stresses, however, that there was no "eyewitness testimony describing the manner in which [he] drove his vehicle on November 3, 2015." He claims that, under the *corpus delicti* rule, his out-of-court statements were not sufficient of themselves to prove that he committed the infractions. Defendant's statement of the rule—"the *corpus delicti* of the offense at issue cannot be proved by the admissions of the defendant alone"—requires elaboration. Here is a more developed version of the rule:

"Simply stated, the *corpus delicti* of an offense is the commission of a crime. [Citation.] In criminal proceedings, the State must prove beyond a reasonable doubt the following two propositions: (1) a crime was committed, the *corpus delicti*, and (2) the identity of the person who committed the crime. [Citation.] Generally, the State cannot prove the *corpus delicti* solely through the defendant's admission, confession or out-of-court statement and must also provide independent corroborating evidence. The independent corroborating evidence need only tend to prove, generally, the commission of an offense. Moreover, the independent corroborating evidence is not required to be identical to the details of the defendant's admission; instead, only some consistency between the two is required tending to confirm and strengthen the defendant's admission. [Citation.] Sufficient corroboration exists where the evidence tends to connect the defendant with the crime. [Citation.]" (Emphasis omitted.) *People v. Smith*, 2015 IL App (1st) 132176, ¶ 18.

¶ 96    There was no eyewitness testimony about defendant's driving on November 3, 2015, yet there was testimony that defendant's collision in Warrenville damaged the front end of his Jeep and the driver's side of the other driver's pickup truck. The condition of the vehicles sufficiently "confirm[ed] and strengthen[ed]" (*id.*) defendant's statements about the accident, namely that he

"attempted to stop" at the intersection (his statement to Feiler) and that he entered it as the light was turning red and "T-boned" a pickup truck (his voice mail).

¶ 97    We uphold defendant's convictions of disobeying a traffic-control device and failing to reduce speed to avoid an accident.

¶ 98                                    2. DUI Conviction

¶ 99    Defendant also challenges his conviction on count I, which charged that he operated a motor vehicle while "under the influence of any \*\*\* drug or combination of drugs to a degree that render[ed] [him] incapable of safely driving," in violation of section 11-501(a)(4) of the Vehicle Code (625 ILCS 5/11-501(a)(4) (West 2014)).   (Defendant does not challenge his conviction on count IV, also charging DUI, and indeed we have no jurisdiction over that count because no sentence was imposed on it.  See *People v. Relerford*, 2017 IL 121094, ¶ 75; *People v. Caballero*, 102 Ill. 2d 23, 51 (1984).)

¶ 100   When the sufficiency of the evidence in support of a criminal conviction is challenged on appeal, a reviewing court, considering all of the evidence in the light most favorable to the prosecution, must determine whether any rational trier of fact could have found beyond a reasonable doubt the essential elements of the crime.  *People v. Brown*, 2013 IL 114196, ¶ 48.  A criminal conviction will be reversed only where the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of the defendant's guilt.  *Id.*

¶ 101   To prove a charge under section 11-501(a)(4) of the Vehicle Code, the State must establish that the defendant (1) drove or was in actual physical control of a vehicle (2) while under the influence of any drug or combination of drugs (3) to a degree that rendered him incapable of safely driving.  *People v. Workman*, 312 Ill. App. 3d 305, 310 (2000).  Defendant

does not dispute that he drove or was in actual physical control of his vehicle at the relevant time.

¶ 102 Defendant raises several challenges to the proof that he drove while under the influence. First, he claims that there is no published case in Illinois where, as here, a defendant was convicted of DUI under section 11-501(a)(4) without proof of any specific drug that was responsible for the defendant's condition. Our research confirms that this case is factually unique but that there is, nonetheless, adequate support in Illinois law for affirming defendant's conviction based on the evidence.

¶ 103 We begin with the statutory definition of the offense. Section 11-501(a)(4) requires proof that the defendant was under the influence of "any *** drug or combination of drugs." 625 ILCS 5/11-501(a)(4) (West 2014). In construing a statute, we will not depart from its plain meaning by reading into it exceptions, limitations, or conditions that conflict with the express legislative intent. *People v. Baskerville*, 2012 IL 111056, ¶ 18. The language of section 11-501(a)(4) does not require proof of a specific drug, and we will not interpolate such a more exacting standard.

¶ 104 We find support in *State v. Daly*, 775 N.W.2d 47 (Neb. 2009), where the Nebraska Supreme Court construed Nebraska's DUI statute, which stated in relevant part:

"(1) It shall be unlawful for any person to operate or be in the actual physical control of any motor vehicle:

(a) While under the influence of alcoholic liquor or of any drug; ***."

Neb. Rev. Stat. § 60-6, 196 (2004).

¶ 105 The court held that "identifying the specific drug that caused a driver's impairment is inessential" under the statute, which "only requires proof that the defendant was under the influence of 'any drug.' " *Daly*, 775 N.W.2d at 61.

¶ 106   The drug-recognition expert Mabbitt opined that defendant was under the influence of a combination of central nervous system depressants and narcotic analgesics.  Section 11-501(a)(4) requires no greater specificity.

¶ 107   Defendant claims that there is language in this court's decision in *Workman* to suggest that the State must, in a prosecution under section 11-501(a)(4), prove the specific drug(s) of which the defendant was allegedly under the influence.  We reject defendant's interpretation of *Workman*.

¶ 108   The defendant in *Workman* was charged with DUI under section 11-501(a)(4) (formerly 625 ILCS 5/11-501(a)(3) (West 1996)).  The arresting officer testified that he came upon the defendant sitting in his pickup truck stopped on a median.  According to the officer, the defendant's speech was slurred and his breath smelled of an alcoholic beverage.  The defendant claimed to have drunk one beer.  After the defendant failed field sobriety tests, the officer arrested him for driving under the influence of alcohol.  However, at the police station, the defendant took a breath test that showed a BAC of 0.01.  The defendant was also found to possess a bottle of prescription medication, lorazepam.  The defendant described the drug as a muscle relaxant and gave conflicting statements as to whether he had taken any that day.  A forensic chemist for the state's attorney testified to the dosage of each pill in the bottle.  *Workman*, 312 Ill. App. 3d at 308.

¶ 109   The officer testified that the HGN test was the only method he knew for detecting whether an individual is under the influence of drugs.  The officer had not, however, administered that particular test to the defendant.  The officer admitted that he had "no training or experience regarding how the ingestion of lorazepam would affect a person's ability to drive."  *Id.* at 309.

¶ 110   The defendant appealed his conviction.  At the outset of our analysis, we laid out some basic principles.  We noted that "[t]here is no 'generic' offense of 'driving under the influence' [citation] and that it is axiomatic that the drug in question must have some intoxicating effect [citation]."  *Id.* at 310.  We also observed that

> "[t]he opinion of an officer regarding whether a person is under the influence of drugs is circumstantial evidence that may be considered sufficient provided that the officer has the relevant skills, experience or training to render such an opinion; in other words, the officer would have to be qualified by the court as an expert in order to reach such a conclusion."  *Id.*

¶ 111   We then surveyed several decisions and derived the following principle:

> "[I]n a case involving a charge of driving under the influence of a drug or combination of drugs, when there is no competent evidence by a qualified witness regarding the nature and effect of the drug alleged to have been ingested and the defendant has not admitted to taking the drug and being under the influence, this lack of competent testimony may create a reasonable doubt of the defendant's guilt, absent other sufficiently incriminating evidence."  *Id.* at 311.

¶ 112   Turning to the facts of the case, we gave the following reasons for reversal:  (1) the officer claimed no "significant experience or expertise in detecting whether a person was driving under the influence of drugs and whether the person was influenced by a drug to such a degree that it prevented his driving safely"; (2) the officer "was not knowledgeable about lorazepam, its nature, or its effects on a driver"; (3) "[t]here was no competent testimony whatsoever regarding [lorazepam's] physiological effects, the amount required to produce any significant effect, or

how the drug would affect a person's ability to drive safely"; and (4) the defendant took no drug tests to confirm whether lorazepam was in his system. *Id.* at 311-12.

¶ 113   Defendant submits that our statement in *Workman* that "*the drug in question* must have some intoxicating effect" (emphasis added) (*id*. at 310) implies that the State must identify the specific drug(s) of which the defendant was allegedly under the influence.  Defendant overlooks the specific point of that statement.  At trial, the State sought to prove that the defendant was under the influence of lorazepam specifically.  The problem with the State's proof was that it failed to link the defendant's symptoms to the "drug in question," lorazepam.  Significantly, the State did not attempt to prove, as the State did in this case, that the defendant was under the influence of an unidentified drug within a broader family of drugs.  Thus, we simply had no occasion in *Workman* to decide whether such proof would be sufficient to support a conviction under section 11-501(a)(4).

¶ 114   Defendant attacks Mabbitt's opinion on two additional grounds:  (1) the trial court had concerns with Mabbitt's demeanor and its impact on her credibility and (2) there were substantive weaknesses in Mabbitt's findings, including a lack of corroboration.

¶ 115   We address first the issue of credibility.  The trial court did point out that Mabbitt was fractious toward defense counsel, yet the court proceeded to characterize her as "combative *but* knowledgeable" (emphasis added), and it accepted her conclusions.  Defendant submits that the court's "credibility concerns" should affect our view of Mabbitt's testimony, but defendant forgets our role as a reviewing court.  We afford great deference to the trial court's assessment of witness credibility, because it was in a superior position to observe the witnesses' demeanor and resolve any conflicts in their testimony.  *People v. Parker*, 2016 IL App (1st) 141597, ¶ 29.  The

trial court ultimately determined that the deficiencies in Mabbitt's demeanor did not undermine her opinions. We are in no position to disturb that assessment.

¶ 116 Defendant attacks the substance of Mabbitt's findings on several grounds. Defendant notes that, though Mabbitt testified regarding (as defendant describes it) "the general physiological effects of the broad categories of drugs presumed to have been ingested by the defendant," Mabbitt did not identify "the amount required to produce any significant effect" or "how the drugs would affect a person's ability to drive safely."

¶ 117 Defendant's criticism is misplaced. Mabbitt identified several symptoms in defendant— including slow movements and compromised coordination and balance—that are commonly accepted as indicators of an impaired ability to drive. Mabbitt explained how these symptoms, as well as defendant's failure of sobriety tests, were attributable to central nervous system depressants and narcotics analgesics. Mabbitt did not, as defendant notes, identify what quantities of such drugs could cause such effects, but this was not a necessary part of the DRE program. The methodology is designed to yield reliable conclusions independently of chemical testing or estimation of the quantities of drugs present. The process of inferring intoxication just from the defendant's condition and conduct is accepted in Illinois courts. "The opinion of an officer regarding whether a person is under the influence of drugs is circumstantial evidence that may be considered sufficient provided that the officer has the relevant skills, experience or training to render such an opinion ***." *Workman*, 312 Ill. App. 3d at 310; see also *People v. Foltz*, 403 Ill. App. 3d 419, 424 (2010); *People v. Vanzandt*, 287 Ill. App. 3d 836, 845 (1997). (Depending on the basis for the officer's opinion that the subject is under the influence of drugs, the officer might need to be qualified as an expert in order for that opinion to be admissible. See *People v. Gocmen*, 2018 IL 122388, ¶¶ 34-37. Here, defendant stipulated that Mabbitt was an

expert in drug recognition.) Scientific evidence of intoxication is unnecessary. *People v. Gordon*, 378 Ill. App. 3d 626, 638 (2007).

¶ 118 Although Mabbitt's opinion would be sufficient of itself to support defendant's conviction (*Workman*, 312 Ill. App. 3d at 310), there was additional evidence of defendant's intoxication. Defendant's repeated characterization of Mabbitt's conclusions as "uncorroborated" is just false. The trial court properly relied on two sources of corroboration. First, the court found that defendant "was not able to exercise ordinary care [in] that he got in two car accidents in a relatively short amount of time." This assessment was accurate in view of defendant's damaging out-of-court admissions about the Naperville and Warrenville incidents. (As discussed, defendant forfeited his challenge to the testimony about the Naperville incident. *Supra ¶¶* 77-80.) Moreover, defendant's account of the Warrenville incident was in turn corroborated by the nature of the damage done to the vehicles involved. Second, the court cited the footage of the field sobriety tests and the DRE program evaluation. The footage shows, as the court described, defendant "struggling with a lot of very basic motor function skills."

¶ 119 Defendant claims that Mabbitt's evaluation was of limited value because she saw his condition only at 6:20 p.m. when she started her evaluation, not at 2:15 p.m. when he committed the offenses. Defendant relatedly asserts that the urine test could show only what substances he eliminated at the time and not what was in his bloodstream at the time of the offenses. Neither observation has weight here. Feiler's testimony and the footage of the field sobriety tests were ample evidence of defendant's condition shortly after the traffic accidents. The footage of Mabbitt's evaluation shows that defendant's condition did not improve in the intervening four hours.

¶ 120   Defendant also criticizes the State for failing to test his blood for the classes of drugs that Mabbitt concluded were in his system.  (The only narcotic that Cava tested for was cocaine.)  For support, defendant cites the First District Appellate Court's remark in *People v. Bitterman*, 142 Ill. App. 3d 1062, 1065 (1986), that direct evidence, such as a negative blood test, can outweigh circumstantial evidence such as an officer's opinion that the defendant was under the influence. Defendant claims that,

> "just as direct evidence can be considered to discredit the circumstantial opinion of the DRE, so to [*sic*] can the absence of direct evidence, especially where, as in this case, the [S]tate had the ability to secure direct forensic evidence to confirm or refute the opinion of the DRE, but failed to, or worse yet chose not to do so."

¶ 121   Defendant suggests an equivalency between (1) the absence of direct evidence of intoxication and (2) the presence of direct evidence that positively undercuts the State's DUI charge.  We could not accept that equivalency without departing from the well-established principle that a DUI charge can be proved without direct evidence of intoxication, such as chemical testing (see *Foltz*, 403 Ill. App. 3d at 424; *Gordon*, 378 Ill. App. 3d at 638; *Workman*, 312 Ill. App. 3d at 310; *Vanzandt*, 287 Ill. App. 3d at 845).  Nothing in *Bitterman* or other Illinois cases suggests that the State's circumstantial evidence in a DUI case has any less weight simply because the State voluntarily dispensed with some or all chemical testing.

¶ 122   Defense counsel suggested at oral argument that the State's proof was inadequate because the State failed to eliminate other possible explanations for defendant's condition.  Counsel admitted, however, that he could cite no case law to support this contention.  Indeed, no such authority exists any longer in Illinois.  See *People v. Schott*, 145 Ill. 2d 188, 202-03 (1991) ("The reasonable doubt test has taken the place of another specialized standard of review, the

reasonable hypothesis of innocence test, a test which was formerly used in circumstantial evidence cases."). Counsel proceeded to clarify that he meant to suggest only that the State's case is stronger where the State can "tie up the ends" and that here the State was unable to "validate" that defendant ingested the classes of drugs identified by Mabbitt. We have analyzed and rejected this claim in the foregoing discussion.

¶ 123   We find sufficient evidence that defendant was under the influence of a drug or combination of drugs when he drove his Jeep on November 3, 2015.

¶ 124                                    III. CONCLUSION

¶ 125   For the foregoing reasons, we affirm defendant's convictions in No. 2-18-0124 (No. 15-DT-2963 below) but vacate his convictions in No. 2-18-0125 (No. 15-TR-99963 below) and remand for further proceedings.

¶ 126   No. 2-18-0124, Affirmed.

¶ 127   No. 2-18-0125, Vacated and remanded.