NOTICE
Decision filed 07/08/22. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2022 IL App (5th) 190362-U

NO. 5-19-0362

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Saline County. |
| | ) | |
| v. | ) | No. 16-CF-334 |
| | ) | |
| JERRY D. LEACH, | ) | Honorable |
| | ) | Walden E. Morris, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE WHARTON delivered the judgment of the court.
Justices Welch and Vaughan concurred in the judgment.

**ORDER**

¶ 1     *Held*: No meritorious argument can be made in this appeal from a judgment of conviction, and therefore the defendant's appointed counsel on appeal is granted leave to withdraw, and the judgment of conviction is affirmed.

¶ 2     The defendant, Jerry D. Leach, appeals from a judgment of conviction. A jury found the defendant guilty of aggravated fleeing or attempting to elude a police officer, a felony, and driving while driver's license suspended, a misdemeanor. Subsequently, the circuit court sentenced him to an extended term of imprisonment, plus a term of mandatory supervised release (MSR), for the aggravated-fleeing charge, and a concurrent term of incarceration for the driving-while-suspended charge. He has finished serving his sentences, including the term of MSR. The defendant's court-appointed attorney on appeal, the Office of the State Appellate Defender (OSAD), has concluded that this appeal lacks merit, and on that basis, OSAD has filed with this court a motion to withdraw

1

as counsel, accompanied by an exhaustive brief in support of the motion. See *Anders v. California*, 386 U.S. 738 (1967). This court gave the defendant ample opportunity to file a written response to OSAD's motion, or a brief, memorandum, etc., explaining why his appeal has merit, but he has not taken advantage of that opportunity. Having examined OSAD's *Anders* motion and brief, along with the entire record on appeal, this court agrees with OSAD that this appeal has no merit. Accordingly, OSAD is granted leave to withdraw, and the judgment of the circuit court is affirmed.

¶ 3                                     BACKGROUND

¶ 4      In October 2016, the defendant was charged by information with aggravated fleeing or attempting to elude a police officer (625 ILCS 5/11-204.1(a)(4) (West 2016)), a Class 4 felony. In June 2017, the State added a charge of driving while driver's license suspended (625 ILCS 5/6-303(a) (West 2016)), a Class A misdemeanor. Trial was repeatedly postponed by the defendant's motion for a fitness evaluation and by other delays occasioned by the defendant.

¶ 5      On July 18, 2018, just before *voir dire* began, the court admonished the defendant as to the nature of the charges and the possible penalties. As to the charge of aggravated fleeing or attempting to elude a police officer, the court stated that it was a Class 4 felony punishable by imprisonment for a term of one to three years, or possibly for an extended term of imprisonment of up to six years. The range of punishment, the court explained to the defendant, would depend upon whether the defendant or the State was correct in recollecting the defendant's criminal history. *Voir dire* was conducted. A jury was chosen and sworn.

¶ 6      Immediately after *voir dire*, and with the jurors out of the courtroom, defense counsel told the judge that he felt duty-bound to inform the court of great difficulties in communicating with the defendant. "Things are becoming aggressive and agitated to the degree that I, frankly, don't know whether he's going to try to hit me," counsel stated, adding that the defendant had been

2

urging him to call a witness who had not been disclosed to the State. The defendant, in answer to the court's query, denied threatening his attorney. The defendant stated that his sole problem with counsel was that counsel was refusing to call Alberta VanHoorebeke as a witness, even though counsel had known of her for some time, and despite the fact that VanHoorebeke had "showed up today." The circuit court noted that it had the authority to decide whether a witness can testify, but otherwise the court did not resolve the issue at that time.

¶ 7 The jury was brought into the courtroom. Opening statements were made. For its case in chief, the State called two witnesses, both of them police officers.

¶ 8 David Morris testified that on October 3, 2016, he was a sergeant with the Harrisburg Police Department. That evening, he was dressed in his police uniform, and was on patrol in a white, unmarked car that was equipped with a siren and red and blue emergency lights, in the car's interior. The car did not have a camera on the dash. At dusk, while on Granger Street, Morris saw the defendant on a motorcycle, along with a female passenger sitting behind him. The defendant was not wearing the required safety glasses, and he turned his head so that Morris could not see his face. Morris "turned around to stop him" in order to tell him about the required glasses. However, the defendant then turned onto West College Street, headed westbound on an eastbound-only roadway. Morris pursued him. He was approximately half a block behind the defendant when he turned on his emergency lights in an attempt to get the defendant to pull over to the side of the road. Instead of pulling over, the defendant accelerated. Morris was approximately half a block behind the defendant when he turned on his siren.

¶ 9 With his siren and emergency lights activated, Morris pursued the defendant on West College Street. He subsequently pursued him on Ledford Street, Lincoln Street, Sloan Street, and on other public roads. As the defendant slowed for turns, Morris came within 10 to 15 feet of the

3

defendant, and the defendant looked toward him. With such a short distance between them, and with his lights and siren activated, Morris thought "there's no way [the defendant] did not know that there was an emergency vehicle behind him." During Morris's pursuit of the defendant, the defendant disobeyed 17 stop signs, disobeyed a traffic-control device at Route 45 and Sloan Street, failed to signal several turns to the right or left, and at one point, on Sloan Street past Main Street, was going 65 miles per hour in a 30-mile-per-hour zone. When Morris was stopped at a red light on Sloan Street, Logan Leverett, a Saline County Sheriff's deputy, picked up the pursuit. Morris's involvement in the pursuit of the defendant had lasted less than one minute.

¶ 10    Logan Leverett testified that on October 3, 2016, he was on duty as a sheriff's deputy in Saline County. He was in uniform and drove an unmarked police cruiser equipped with red and blue lights and a siren. The cruiser had a camera on the dashboard, but it was not working. Because of all that he had heard over his police radio, Leverett was waiting in his car at a gas station on Commercial Street in Harrisburg. Leverett saw the defendant driving a motorcycle eastbound on Sloan Street, traveling "[a]pproximately 65, 70 miles an hour." The motorcycle was being followed by a police car. The defendant ran the red light on Sloan Street at Commercial, but the police car that was following him did stop for the light. At that point, Leverett picked up the pursuit of the defendant.

¶ 11    It was dark outside as Leverett turned on his flashing lights and siren, and drove off the gas station's lot. The defendant's motorcycle immediately accelerated. Leverett followed the defendant eastbound on Sloan Street, traveling 65 miles per hour but not catching up to him. The defendant "ran a stop sign going into the parking lot at Harrisburg Medical Center," "continued through the parking lot onto Wilma Street and eventually laid the bike over in the gravel parking lot just north of Harrisburg Medical Center." A female identified as Alberta VanHoorebeke was

4

also on the motorcycle. Leverett took the defendant into custody, and placed him in the backseat of his cruiser. Because the defendant complained about his shoulder, police took him inside Harrisburg Medical Center for examination. He was subsequently released to jail personnel.

¶ 12     After the State's two witnesses testified, the State offered into evidence a certified record from the Illinois Secretary of State. It showed that the defendant's driving privileges were suspended on October 3, 2016.

¶ 13     The defendant moved for a directed verdict. The court denied the motion.

¶ 14     For his case in chief, the defendant called Alberta VanHoorebeke. She recalled an incident in October 2016, when she was the passenger on the back of a motorcycle that was being driven by her good friend, the defendant. The defendant had just gotten a phone call informing him that his mother was at the local hospital; the two were headed there. It was nighttime. On Granger Street, the motorcycle was moving in the same direction as "two cop cars." VanHoorebeke did not remember whether these two police cars were marked or unmarked. The two police cars passed the motorcycle. When the motorcycle stopped for a stop sign on Granger Street, the two police cars "turned around," facing toward the motorcycle. Meanwhile, VanHoorebeke continued, the defendant turned right, onto another road. The two police cars followed them. The driver of one car activated its flashing red and blue lights and its siren. Soon, that car "got up really close" to the motorcycle and "tried hitting [the] back tire." The defendant continued driving because the two cars were "coming at [them] so fast" that "they probably would have hit [the] back tire." VanHoorebeke soon became "[v]ery scared" that the two cars would cause a wreck involving the motorcycle. Stopping the motorcycle was nearly impossible in light of the cars' "aggressive" actions. However, there were times when the pursuing cars were relatively far behind them, and the defendant had opportunities to stop the motorcycle. As the chase continued, the two original

5

cars were joined by at least three other cars. Although the defendant "slowed down" for stop signs, he did not stop completely. The chase ended with the defendant's "la[ying] the bike down right there at the hospital." The entire incident, starting on Granger Street and ending at the hospital, lasted 5 to 10 minutes. VanHoorebeke admitted that the chase would have ended if the defendant had stopped his motorcycle, and she would have been safe and not needed to worry about an accident.

¶ 15    The defendant, age 47, testified on his own behalf. According to the defendant, he received a telephone call from his sister one night in October 2016, at approximately 10:30, informing him that his mother was dying and had been rushed to the hospital. His mother had been in bad shape as the result of a blood clot. The defendant decided to drive his motorcycle to the hospital. Alberta VanHoorebeke was his passenger. For the nighttime drive, the defendant wore his "clear glasses." On Granger Street, he was stopped at a stop sign, and two police cars, one marked and the other unmarked, were nearby. The defendant looked over and "waved at the officer." The officer looked at him. Then, the officer proceeded through the stop sign. However, he "immediately turned around" and "came back." The other car did likewise. The defendant thought he remembered saying, "They're pulling us over, Alberta." The defendant "made a right, pulled over on the side of the road right there." Just then, the officer "came flying up and tried to hit the back of the bike." The defendant reacted to this movement by "scoot[ing] up a little on the motorcycle." Just then, "the other car came around like that." The defendant thought that the second car would "smack the back of the bike," so he "moved up a little bit." Neither car had its siren or flashing lights activated. The defendant commented to VanHoorebeke that the police cars were "trying to hit us." The defendant "took off—not real fast—maybe 15 miles an hour at the most." The defendant made a right turn. One of the officers "cut through" someone's yard and "tried to swipe the back of the

6

bike." At that point, the defendant "knew" that the police "was trying to hit" the motorcycle. "As God is my witness [*sic*], they were trying to hit us."

¶ 16　The defendant was familiar with the driver of one of the two police cars, Officer Morris. At some point in the past, the defendant was sitting on his front porch while Morris ran "up and down the street" with his gun drawn while yelling, "'Where you at, Jerry Leach?'" Morris apparently thought that the defendant had been the perpetrator of some crime, but ultimately the police apprehended someone else that day. The defendant did not know why Morris "had it out for [him]" all of the time.

¶ 17　Feeling sure that the police were trying to hit his motorcycle, the defendant "gave it a little gas," arrived at Ledford and Sloan Streets, "slowed down a little, looked," and saw that the police "were flying up" toward them again. He proceeded through the intersection, with the two police cars still pursuing him. The pursuit continued in this manner, with three to five police cars eventually joining the original two. The defendant drove as fast as 35 miles per hour on the side streets. Near VanHoorebeke's house, the defendant tried to let VanHoorebeke off the motorcycle, for her safety's sake. He slowed considerably, but he could not stop because the police were too close and moving too fast. "They were right on me. *** The entire time." During this whole pursuit, one or another police car came within one foot of the motorcycle on several occasions. Also, at least one police car had its siren and flashing lights on. The defendant finally decided to "put the bike down" at the hospital. As for his driver's license, the defendant did not know that it was suspended that day, adding, "That's the honest to God's truth."

¶ 18　For its rebuttal case, the State recalled David Morris. Essentially, Morris testified that during his pursuit of the defendant's motorcycle, he never drove across anyone's lawn, and the defendant had numerous opportunities to stop safely. Morris denied that he ever had displayed a

gun while searching for the defendant, but he stated that he had chased the defendant on foot on two prior occasions, without success. Morris did not recognize the motorcycle's driver as the defendant until after he was placed under arrest near the hospital.

¶ 19 The jury returned verdicts finding the defendant guilty as charged. That is, the jury found him guilty of aggravated fleeing or attempting to elude a police officer and of driving while driver's license suspended.

¶ 20 In August 2018, the defendant filed a *pro se* document captioned, "Issues I'd Like to Raise on Record, for Purpose of Securing My Rights on Appeal." In that document, the defendant discussed a wide variety of issues relating to pretrial and trial proceedings, including claims of ineffective assistance of trial counsel. (The court apparently viewed that document as an expression of the defendant's desire for an appeal; the court did not consider the document a posttrial motion, and never mentioned the document until well after the defendant's sentencing.)

¶ 21 On August 29, 2018, and September 12, 2018, the court held a sentencing hearing. The presentence investigation report, upon which the court relied, showed that the defendant had an extensive criminal record dating back to 1990, when the defendant was convicted of burglary and two battery charges in three separate case files from Cook County, Illinois. The defendant provided the only live testimony at the sentencing hearing, describing the circumstances of his recent dismissal from a drug-rehabilitation program, and his potential for rehabilitation generally. The State pointed out that the defendant, at the time he committed the two instant offenses, was on pretrial release in two unrelated Saline County felony cases. The State also presented certified copies of the defendant's convictions in four felony cases from Franklin County, Illinois. These included a conviction for aggravated battery, a Class 3 felony, in case No. 06-CF-221, for which the defendant was sentenced to imprisonment for a term of 6½ years. In the instant case, the circuit

8

court sentenced the defendant as follows: for aggravated fleeing or attempting to elude a police officer, imprisonment for an extended term of five years, plus one year of MSR, and for driving while driver's license suspended, 364 days of incarceration, concurrent with the prison sentence.

¶ 22    In October 2018, the defendant simultaneously filed, *pro se*, a motion to reduce sentence and a notice of appeal. In November 2018, the defendant's appointed attorney on appeal, OSAD, filed in this court a motion to dismiss the appeal as premature. This court granted the motion to dismiss the appeal.

¶ 23    With the case back before the circuit court, the defendant's trial counsel was granted leave to withdraw. The court appointed a new posttrial attorney.

¶ 24    In March 2019, the new posttrial attorney filed, on behalf of the defendant, a motion for a new trial and a motion to reconsider sentence. In the former motion, the defendant claimed that various specified errors by the trial court and trial counsel had deprived him of a fair trial. In the latter motion, he alleged that his sentence was excessive, and that the sentencing court ignored mitigating factors.

¶ 25    In April 2019, the defendant filed a handwritten *pro se* document describing a wide variety of alleged errors by trial counsel, the trial prosecutor, and the trial court. In May 2019, the defendant filed a handwritten *pro se* document captioned, "Issues to be Raised and Placed on Record for Preserving Appeal Rights."

¶ 26    In June 2019, the defendant, by posttrial counsel, filed a "first amended motion for new trial." This first amended motion included all of the claims found in the original motion filed in March 2019, plus a few more claims that the defendant personally wanted to include, for a grand total of 28 claims. (More information about these 28 claims will be presented in the analysis portion of this order, *infra*.) The State filed a written response to the first amended motion.

¶ 27 On July 2, 2019, the court held a hearing on the "first amended motion for a new trial," filed in June 2019, and the motion to reduce sentence, filed in March 2019. Posttrial counsel informed the court that all of the defendant's *pro se* claims had been incorporated into the first amended motion for new trial. No witnesses testified at this hearing. Defense counsel briefly argued in favor of a few of the claims presented in his first amended motion for a new trial. Specifically, counsel argued (1) that the court erred in failing to definitively state, prior to the commencement of the defendant's trial, whether the defendant was eligible for extended-term sentencing; (2) that the trial court erred in failing to grant the defendant's motion for a continuance of the trial; (3) that the trial court erred in allowing evidence that the defendant had active warrants at the time of the offenses; (4) that the trial court erred in denying the defense motion for a directed verdict; (5) that trial counsel had failed to attempt to contact a defense witness, Jennifer Quertermous; and (6) that trial counsel had failed to cross-examine police officer David Morris about "discrepancies" between his trial testimony and his written police report, such as his location when he first contacted dispatch, and the defendant's wearing or not wearing safety glasses. As for all the other claims in the first amended motion for a new trial, defense counsel stood on the motion. The defendant personally argued that portions of Morris's testimony were simply not credible. At the hearing's end, the court took the matters under advisement.

¶ 28 On July 31, 2019, in a docket-entry order, the court denied both the first amended motion for a new trial and the motion to reduce sentence. According to the court, every one of the defendant's claims was "factually inaccurate and or lacks legal merit."

¶ 29 In August 2019, the defendant filed, by counsel, a notice of appeal, thus perfecting the instant appeal. The circuit court appointed OSAD to represent the defendant on appeal. OSAD subsequently filed an amended notice of appeal.

¶ 30                                   ANALYSIS

¶ 31     This appeal is from a judgment of conviction.  As previously mentioned, the defendant's

appointed attorney on appeal, OSAD, has concluded that this appeal lacks merit, and accordingly

it has filed an *Anders* motion to withdraw as counsel.  This court agrees with OSAD's assessment

of this appeal.  Therefore, OSAD's *Anders* motion must be granted, and the judgment of conviction

must be affirmed.

¶ 32     In the brief that accompanies the *Anders* motion, OSAD addresses four potential issues on

appeal.  They are (1) whether the State failed to prove the defendant guilty beyond a reasonable

doubt; (2) whether any sentencing considerations are still justiciable in light of the fact that the

defendant's sentence, including his term of MSR, has expired; (3) whether trial counsel provided

ineffective assistance; and (4) whether the defendant was deprived of a fair trial by any of the

several errors that he alleged the trial court and the State had committed.  This court addresses

these potential issues in turn.

¶ 33     The first potential issue presented by OSAD is whether the State proved the defendant

guilty beyond a reasonable doubt.  At trial, the State bears the burden of proving a defendant guilty

beyond a reasonable doubt.  U.S. Const., amend. XIV; *In re Winship*, 397 U.S. 358, 367 (1970).

On review, an appellate court will reverse a conviction only if, while viewing the evidence in the

light most favorable to the State, it concludes that no "rational trier of fact could have found the

essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307,

319 (1979); *People v. Cunningham*, 212 Ill. 2d 274, 278 (2004).  The trier of fact determines the

credibility of the witnesses.  *People v. Evans*, 209 Ill. 2d 194, 211 (2004).  The jury, acting as the

trier of fact, is responsible for assigning weight to the testimony of witnesses, for resolving

inconsistencies or conflicts in the evidence, and for drawing reasonable inferences therefrom.

11

*People v. Sutherland*, 223 Ill. 2d 187, 242 (2006). "The testimony of a single witness, if it is positive and the witness credible, is sufficient to convict." *People v. Smith*, 185 Ill. 2d 532, 541 (1999).

¶ 34    In the instant case, the defendant was on trial for two offenses. They were (1) aggravated fleeing or attempting to elude a police officer (625 ILCS 5/11-204.1(a)(4) (West 2016)) and (2) driving while driver's license suspended (625 ILCS 5/6-303(a) (West 2016)).

¶ 35    As to the first of these two offenses, the aggravated-fleeing count, the court properly instructed the jury that in order to find the defendant guilty, it had to find that five propositions had been proved, *viz.*: (1) that the defendant was the driver or operator of a motor vehicle; (2) that the defendant was given a visual or audible signal by a police officer directing him to bring his vehicle to a stop; (3) that the peace officer was in police uniform, and, if the officer was driving a vehicle, that the vehicle displayed illuminated, oscillating, rotating, or flashing red or blue lights, which when used in conjunction with an audible horn or siren, would indicate the vehicle to be an official police vehicle; (4) that the defendant willfully failed or refused to obey such signal in order to flee or attempt to elude the officer; and (5) that such flight or attempt to elude by the defendant involved disobedience of two or more traffic control devices. Illinois Pattern Jury Instructions, Criminal, No. 23.02, modified; 625 ILCS 5/11-204.1(a)(4) (West 2016). The State's two witnesses, police officers Morris and Leverett, provided abundant testimony on each of these five propositions. Moreover, the defendant—or his witness, Alberta VanHoorebeke—essentially admitted to these five propositions (except for the one about the police officers being in uniform). For example, the defendant testified that he thought the police wanted him to pull over his motorcycle, and that he saw flashing lights, and heard a siren, from at least one of the police cars that followed him.

12

¶ 36     The defendant sought to defend himself against this aggravated-fleeing charge by asserting that his actions were necessary to avoid a wreck. Thus, the defendant's defense added a sixth element to the offense—"[t]hat the defendant did not act out of necessity." Illinois Pattern Jury Instructions, Criminal, No. 24-25.22A. The jury was so instructed. The definition of necessity was also given to the jury. It read:

> "Conduct which would otherwise be an offense is justifiable by reason of necessity if the defendant was without blame in occasioning or developing the situation and reasonably believed that such conduct was necessary to avoid a public or private injury greater than the injury which might reasonably result from his own conduct." Illinois Pattern Jury Instructions, Criminal, No. 24-25.22; 720 ILCS 5/7-13 (West 2016).

It is no wonder that a necessity defense was unsuccessful. Everyone who testified at the trial, whether for the State or for the defense, made clear that the defendant had plenty of opportunity to pull over; he did not need to take the officers on this ridiculous chase that endangered everyone on the road that evening, including his passenger on the motorcycle. Even the defendant testified that when the police first turned around on Granger Street and attempted to stop him, the defendant "made a right [onto West College Street], pulled over on the side of the road right there." He should have remained on the side of the road. If he had, this entire chase could have been avoided. A rational trier of fact certainly could have found the essential elements of aggravated fleeing or attempting to elude a police officer, and found them beyond a reasonable doubt.

¶ 37     As to the second of the defendant's two offenses, *i.e.*, driving while driver's license suspended, the State had no difficulty in proving its two elements—(1) that the defendant was driving or in actual physical control of a motor vehicle on any highway of this state, and (2) that his driver's license was suspended at the time. 625 ILCS 5/6-303(a) (West 2016). The defendant

13

admitted to the two elements, and the State produced a certified copy of the driving abstract from the Illinois Secretary of State showing that his license was indeed suspended on October 3, 2016. The fact that the defendant was unaware of the suspension at the time he drove makes no difference for this absolute-liability offense. See *People v. Espenscheid*, 109 Ill. App. 2d 107, 111 (1969) ("mental state" is not involved in the offense of driving while driver's license suspended).

¶ 38 In short, the evidence of the defendant's guilt, on both charges, was overwhelming. It was as close as real life comes to being an open-and-shut case.

¶ 39 The second potential issue presented by OSAD is whether any sentencing considerations are still justiciable in light of the fact that the defendant's sentence, including his term of MSR, has been completed. In the "first amended motion for new trial," the defendant alleged that he was not given sufficient notice that he was subject to an extended term. In the motion to reconsider sentence, he alleged that his sentence was excessive in light of mitigating factors. However, as the website of the Illinois Department of Corrections (DOC) seems to suggest, and as OSAD's and this court's calculations make perfectly clear, the defendant has completed his entire sentence, including the term of MSR. The defendant's name does not appear in the DOC's inmate-search database, suggesting that he has completed MSR. It was on September 12, 2018, that the court sentenced the defendant to an extended term of imprisonment of five years for aggravated fleeing or attempting to elude a police officer, to be followed by one year of MSR, and 364 days for driving while driver's license suspended, concurrent with the aggravated-fleeing sentence. He received credit for 494 days of presentence incarceration, and he was eligible for day-for-day good-conduct credit. See 730 ILCS 5/3-6-3(a)(2.1) (West 2016) (except for enumerated offenses, prisoner shall receive "one day of sentence credit for each day of his or her sentence of imprisonment"). Taking everything into account, the defendant would have finished his year of MSR in early November

14

2020, more than 1½ years ago. "Since the sentence has been served, the question of the validity of its imposition is moot, and it is unnecessary for this court to consider it further." *People v. Murrell*, 60 Ill. 2d 287, 294 (1975).

¶ 40   Even if the sentencing issues were not moot, they are meritless. For example, his claim that he was not eligible for extended-term sentencing for aggravated fleeing, a Class 4 felony, is meritless due to his prior conviction for aggravated battery, a Class 3 felony, in Franklin County case No. 06-CF-221, a crime for which he was sentenced to 6½ years of imprisonment. See 730 ILCS 5/5-5-3.2(b)(1) (West 2016) (reasons to impose an extended-term sentence). (OSAD wrote that the defendant was extended-term eligible by virtue of his Class 3 felony conviction in Franklin County case No. 07-CF-387. However, the trial prosecutor, during a discussion just prior to *voir dire*, indicated that that particular conviction had been reversed on appeal.)

¶ 41   The third potential issue presented by OSAD is whether trial counsel provided ineffective assistance. Generally, when a defendant alleges ineffective assistance of counsel, he must make two separate showings: (1) that counsel's assistance was deficient, *i.e.*, that it fell below an objective standard of reasonableness, and (2) that there is a reasonable likelihood that counsel's deficient performance prejudiced the defendant, so that the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). "[I]n order to establish deficient performance, the defendant must overcome the strong presumption that the challenged action or inaction may have been the product of sound trial strategy," and "[m]atters of trial strategy are generally immune from claims of ineffective assistance of counsel." (Internal quotation marks omitted.) *People v. Manning*, 241 Ill. 2d 319, 327 (2011). "[D]ecisions regarding what matters to object to and when to object are matters of trial strategy." (Internal quotation marks omitted.) *People v. Perry*, 224 Ill. 2d 312, 344 (2007). To make out a claim of ineffective

15

assistance of counsel, "[a] defendant must satisfy both prongs of the *Strickland* test," but "if the ineffective-assistance claim can be disposed of on the ground that the defendant did not suffer prejudice, a court need not decide whether counsel's performance was constitutionally deficient." *People v. Griffin*, 178 Ill. 2d 65, 74 (1997).

¶ 42 The defendant and posttrial counsel raised several claims of ineffective assistance by trial counsel. In its *Anders* brief, OSAD specifically mentions that trial counsel (1) failed to subpoena and call a witness named Jennifer Quertermous, who would have "impeached" the testimony of State's witness Morris, (2) failed to subpoena dash camera footage, (3) failed to subpoena a police log to see which officers were working that night, (4) failed to show him the discovery, (5) failed to investigate his issues, and (6) failed to determine whether College Street was two-way after school hours. However, OSAD then states that "the claims about discovery, which evidence to subpoena, which witnesses to call, and which witnesses to investigate are all undermined by the fact that, according to what [trial counsel] told the judge in open court, [the defendant] was a no-call/no-show at three separate meetings [counsel] had scheduled for them prior to trial, on June 11, July 2, and July 17, 2018." It is true that trial counsel told the judge that the defendant had failed to appear for meetings on those dates, and that the purpose of those meetings was, in trial counsel's words, "to try to make sure that [the defendant] was competently represented, that we could present a defense" including "witnesses [the defendant] may want to call." As OSAD comments, "[the defendant] alleges several failures by [trial counsel], but the failure is really [the defendant's] failure to show up to the meetings at which he and [defense counsel] were supposed to accomplish the very things [the defendant] is now complaining did not get done." Certainly, the defendant did not dispute that his attorney had scheduled those meetings or that he himself had failed to attend them.

16

¶ 43    Moreover, as OSAD also states, the defendant cannot show prejudice from any of these alleged failures by counsel.  Indeed, he failed to show prejudice when he had the opportunity to show it in the circuit court.  The defendant certainly cannot expect a reviewing court to divine the prejudice visited upon him by trial counsel's supposed errors. As discussed *supra*, the combined testimonies of the defendant and of defense witness VanHoorebeke served to provide (essentially) all of the evidence needed to establish the defendant's guilt beyond a reasonable doubt.  There is no reasonable probability that the trial's result would have been any different if trial counsel had performed differently.

¶ 44    The fourth potential issue presented by OSAD is whether the defendant was deprived of a fair trial by any of the several errors that he alleged the trial court and the State had committed. The defendant claimed that the trial court erred in denying a directed verdict, in not allowing the jury to hear the directed verdict motion and ruling, and in allowing evidence that the defendant had active warrants at the time he fled police on October 3, 2016.  The defendant claimed that the State erred in telling witness VanHoorebeke to stop looking at the defendant and asking her whether she was afraid of the defendant.

¶ 45    When deciding a motion for a directed verdict, the trial court determines only whether a reasonable mind could fairly conclude the guilt of the accused beyond a reasonable doubt, while considering the evidence most strongly in the State's favor.  In moving for a directed verdict, the defendant admits the truth of the facts stated in the State's evidence, for purposes of the motion. *People v. Aljohani*, 2021 IL App (1st) 190692, ¶ 78. Without question, once you admit the truth of the trial testimonies of Morris and Leverett, plus the certified driving abstract, a reasonable mind could fairly conclude that the defendant was guilty of both charges against him, beyond a reasonable doubt.  Also, there is no absolute right to make any argument at all on a motion for

directed verdict. *People v. Withers*, 87 Ill. 2d 224, 230-31 (1981). Given that there is no right to argue, there cannot be a right to have the jury hear that argument. Additionally, the motion for directed verdict is a purely legal matter, entirely within the purview of the trial court; there is nothing for the jury to do regarding such a motion. There was no error in the court's denying the defendant's directed-verdict motion, or in the manner in which the court denied it. (Frankly, it is difficult to imagine why the defendant would have wanted the jury to hear his motion for a directed verdict and the circuit court's denial of the motion. The jury may have viewed the ruling as the circuit court's endorsement of the defendant's guilt.)

¶ 46    There also was no error in allowing the State to present evidence that the defendant had outstanding "warrants for [his] arrest" at the time he fled from the police. Although "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person," such evidence may be admissible for "other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Ill. R. Evid. 404(b) (eff. Jan. 1, 2011). In the instant case, evidence that the defendant had outstanding warrants against him was admissible for the purpose of proving his motive for fleeing the police. The defendant testified that he had sped away from the officers in order to avoid a wreck and injury to his passenger. The State was permitted to present evidence of a very different motive—to escape an arrest on outstanding warrants. (That is especially the case where the evidence did not even mention the crimes—aggravated battery and unlawful possession of a converted license plate—for which the defendant was wanted, thus minimizing prejudice to the defendant.)

¶ 47    Also, there was no error in the State's telling witness VanHoorebeke to stop looking at the defendant and asking her whether she was afraid of the defendant. "[A] trial court can generally correct any error resulting from an improper remark by sustaining an objection or instructing the

18

jury to disregard the statement." *People v. Bell*, 343 Ill. App. 3d 110, 116 (2003). In this case, when the State made the statement and asked the question that it did, trial counsel for the defendant interposed an objection. The trial court then chided the State, stating that witness VanHoorebeke was free to look at the defendant. "If you think [the defendant] is doing something inappropriate, you can bring that to the Court's attention. She can look at me. She can look at you. She can look at the jury. So that objection will be sustained." Given the strength of the evidence against the defendant—evidence from both the State's witnesses, and the defendant and his witness—there is nothing to the argument that this limited episode deprived the defendant of a fair trial.

¶ 48    As for the remainder of the issues presented in the "first amended motion for new trial," and the motion to reconsider sentence, they are, in the words of OSAD, "irrelevant, wholly conclusory, or rebutted by the record."

¶ 49    An example of an irrelevant claim is the defendant's argument that he could not be guilty of driving while license suspended because he never had a motorcycle license. However, "driver's license" is defined as "[a]ny license to operate a motor vehicle issued under the laws of this State." 625 ILCS 5/1-116.1 (West 2016). Whether his license had an "M" classification permitting him to drive a motorcycle is irrelevant.

¶ 50    Examples of wholly conclusory claims are the defendant's claims that "[t]he manner of jury selection was improper," "[t]he manner of arraignment was improper," "[t]he defendant's right to speedy trial was violated," "[t]he state engaged in malicious prosecution," "[t]he defendant's due process rights were violated," and portions of the testimonies of State's witnesses Morris and Leverett were "irrelevant, immaterial, and/or too prejudicial to the defendant." None of those claims was accompanied by any specifics at all. A defendant must state "specific grounds for objection" if he wants to preserve an issue for appeal. *People v. Johnson*, 219 Ill. App. 3d 949,

19

951 (1991). "[M]erely vague, general allegations of error in a posttrial motion are insufficient to preserve a claim for appeal" and will result in "the waiver of the issue." (Internal quotation marks omitted.) *People v. Lenz*, 2019 IL App (2d) 180124, ¶ 79. The defendant's wholly conclusory arguments are waived. Also, there was no contemporaneous objection relating to Morris's or Leverett's testimony, or to the manner of jury selection, so those issues are waived for that reason too. See *People v. McLaurin*, 235 Ill. 2d 478, 485 (2009) ("to preserve a claim of error for review, counsel must object to the error at trial and raise the error in a motion for a new trial before the trial court"). In addition, this court cannot identify anything at all improper or erroneous in any of these matters.

¶ 51 Finally, some of the defendant's claims are flat-out rebutted by the record. For example, the defendant claimed that the jury "heard" his trial attorney comment that he feared the defendant might punch him in the face. As this court has noted, *supra*, the jury was not in the room at the time the comment was made; there is no reason to imagine that the jury heard the prejudicial comment.

¶ 52                          CONCLUSION

¶ 53 For all of the reasons stated above, this appeal has no merit whatsoever. Accordingly, OSAD's *Anders* motion for leave to withdraw as counsel is granted, and the circuit court's judgment of conviction is affirmed.

¶ 54 Motion granted; judgment affirmed.