2022 IL App (2d) 210424-U
No. 2-21-0424
Order filed November 29, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).
_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Du Page County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 20-DT-311 |
| NATALIE ZINELLI, | ) ) | Honorable Michael W. Reidy, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE BIRKETT delivered the judgment of the court.
Justices Hutchinson and Hudson concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The evidence was sufficient to determine beyond a reasonable doubt that defendant was incapable of safely driving her vehicle, and her conviction for driving under the influence of cannabis is affirmed. The written sentence for disobeying a stop sign conflicted with the court's oral pronouncement and is modified to accord with the court's oral pronouncement.

¶ 2   Following a bench trial before the circuit court of Du Page County, defendant, Natalie

Zinelli, was found guilty of driving under the influence of cannabis that rendered her incapable of

driving safely (DUI cannabis) (625 ILCS 5/11-501(a)(4) (West 2020)) and disobeying a stop sign

(*id.* § 11-1204(b)). Defendant was sentenced to a 12-month term of court supervision on the DUI

cannabis charge, and, for disobeying a stop sign, her sentencing order read that she was sentenced

to a 12-month term of conditional discharge. Defendant appeals her conviction for DUI cannabis, arguing that the State failed to prove beyond a reasonable doubt that she was incapable of safely driving because the evidence was insufficient to support a finding on that element of the offense. Defendant also appeals her sentence for disobeying a stop sign because it exceeds the maximum sentence allowed for the offense. We affirm as modified.

¶ 3                                I. BACKGROUND

¶ 4      We summarize the facts relevant to the issues on appeal appearing in the record. At about 11 p.m. on February 10, 2020, defendant was stopped by Glen Ellyn police officer David Gill, a trained and certified drug recognition expert (DRE), for disobeying a stop sign. After field testing and interviews at the police station, defendant was charged with various counts of DUI relating to alcohol and cannabis and a count of unlawfully possessing a "stun gun" (which was eventually nol-prossed).

¶ 5      On March 11, 2021, the matter advanced to a bench trial on the various DUI counts and the count of disobeying a stop sign. The parties stipulated that Gill had received training and certification in drug recognition, as provided by the International Association of Chiefs of Police and the National Highway Traffic Safety Administration. Specifically, the parties testified that Gill was an expert in detecting and identifying individuals under the influence of drugs and in identifying the category of drugs causing the impairment.

¶ 6      Gill testified that he had been a DRE for nearly two years and had evaluated 45 persons for drug influence and drug impairment. In addition to the evaluations, he had arrested a further 20 persons for DUI drugs and had arrested a further 80 to 100 arrests for DUI alcohol or combination of alcohol and drugs. Gill also had been employed by the Village of Glen Ellyn as a police officer

for nearly 13 years and had received training in both detection of alcohol impairment along with the drug recognition training. Regarding the alcohol detection training, he had also received training in administering and interpreting the standardized field sobriety tests, and he had received training at the police academy and through the Glen Ellyn police department. Gill briefly explained that the drug recognition protocol consisted of a 12-step process that included various tests, observations, and interviews. According to Gill, the drug recognition protocol was a generally accepted and reliable means of identifying whether a subject was under the influence and impaired by a class or classes of drugs. Gill also testified that, as the culmination of his drug recognition training, he was required to perform the protocol on 12 subjects and his opinion and conclusions had to correctly identify the type of drug or drugs in at least 75% of the 12 test subjects.

¶ 7 Turning to the February 10 incident, Gill testified that he was on a stationary traffic detail at the intersection of Main Street and Hillside in Glen Ellyn. At approximately 11 p.m., Gill observed defendant's vehicle approach the stop sign. The vehicle did not slow and proceeded through the intersection. After defendant drove through the intersection without obeying the stop sign, he initiated a traffic stop. Gill identified defendant as the driver, and he testified that she pulled into a parking lot adjacent to a restaurant.

¶ 8 Gill engaged defendant in discussion about the reason for the stop. When defendant rolled down her window, Gill detected a strong odor of freshly burnt cannabis and a faint odor of alcohol from the interior of her vehicle. Defendant told him she had left her job at a bar in Roselle at around 9 p.m., and defendant did not tell him she had made any stops between Roselle and Glen Ellyn. Defendant admitted to Gill that she had consumed a single margarita earlier, but Gill could not recall that defendant mentioned a specific time that she had the drink. Defendant denied that

she had smoked cannabis that day but admitted that another person had smoked cannabis in her car. Defendant admitted, however, that she had smoked cannabis the previous day. Defendant did not fumble passing her driver's license or insurance card to Gill. Gill observed that defendant's eyes were glassy and bloodshot, and he believed that her pupils were dilated. Gill explained that dilated pupils suggested that an individual had consumed cannabis or alcohol. Based on his observations, Gill decided to administer field sobriety tests to defendant as part of a drug recognition evaluation to determine whether defendant was impaired.

¶ 9     Gill asked defendant to exit her vehicle, and defendant did not appear to have any difficulty exiting the car, and she did not stumble or fall once she had exited. Additionally, no alcohol or drugs were found in defendant's car, and no warrant for toxicology testing or for a urinalysis was sought. As part of the drug evaluation protocol, Gill asked defendant to take a Breathalyzer test, but she declined. Gill then conducted preliminary questioning about what defendant had to eat or drink, and whether she had medical conditions. AS the next step of the protocol, Gill took defendant's pulse, determining it to be elevated. Gill explained that cannabis and alcohol use can cause an elevated pulse.

¶ 10     Gill performed the field sobriety tests at the scene of the stop and again at the station as part of his drug recognition evaluation, except for the alphabet test, which he performed only at the scene of the stop. Gill explained that the field sobriety tests are standardized to indicate alcohol intoxication but are not calibrated to determine intoxication from other drugs. Nevertheless, the field sobriety tests could show impairment from any category of drug, including alcohol. The tests are not 100% accurate to show alcoholic intoxication or other impairment.

¶ 11    During the walk-and-turn test at both the scene and the station, defendant showed six of eight total clues, which indicated impairment. During the one-leg-stand test administered at the scene, defendant showed one clue out of a possible four clues, and this did not indicate impairment. However, when the one-leg-stand test was repeated at the station, defendant showed three of the four clues standing on her right leg and two of the four clues standing on her left leg, indicating impairment.

¶ 12    Gill administered a modified Romberg test which allows the administering officer to observe the subject for telltale tremors, swaying, and inability to follow directions as well as to measure the subject's ability to determine the passage of time. Gill explained that time distortion can impact the subject's ability to drive safely. The administering officer instructs the subject to stand with her hands at her side, feet together, and to tell the officer when 30 seconds have passed. A difference of five seconds or more (*i.e.*, less than 25 seconds or more than 35 seconds) indicates subjective time distortion. At the scene, defendant exhibited eyelid tremors, body tremors, and was swaying an inch from side to side, which were indicative of cannabis use. Defendant also stopped the count at 21 seconds, which showed her time-sense was distorted. At the repeat of the test at the station, Gill observed eyelid tremors and a one-inch sway, and defendant stopped the test at 18 seconds. Gill explained that the station test "could indicate that somebody is feeling the effects" of the drug at the time of the second modified Romberg test.

¶ 13    Gill next administered the finger-to-nose test. This test is a divided attention test and shows if the subject can follow directions and concentrate, and whether the subject is experiencing memory loss. To perform the test, the subject closes her eyes and tilts back her head, while holding her hands at their sides. The administering officer will give a command of "left" or "right," and

the subject will touch the tip of the index finger of the corresponding hand to the tip of her nose and immediately return it to her side. Forgetting the rules of the test is a general indication that the subject could be under the influence of cannabis.

¶ 14    When Gill administered the finger-to-nose test to defendant at the scene, she missed the tip of her nose with the tip of her index finger multiple times, opened her eyes, brought her head forward, had eyelid tremors, and had difficulty in following his directions for the test. When defendant performed the test at the station house, she again missed the tip of her nose with the tip of her index finger "several" times, brought her head forward, exhibited eyelid tremors, and had difficulty in following his directions. In addition, during the station test, defendant swayed and exhibited body tremors. Defendant's performance, her tremors, lack of concentration, and the memory lapses were all indications of possible cannabis consumption.

¶ 15    Gill next administered the convergence test, which consisted of moving stimulus in two circles before the subject's eyes to determine if they are tracking the stimulus. After the circles, the administrating officer moves the stimulus directly toward the subject's nose, stopping about an inch away, to determine if the subject's eyes can both converge on the stimulus. If the subject's eyes cannot converge, this result would be consistent with possible cannabis consumption. Defendant exhibited a lack of convergence, which was consistent with cannabis and alcohol consumption.

¶ 16    Gill administered the alphabet test at the scene but omitted it from his testing at the station. Defendant was instructed to recite the alphabet from C to M, but she recited the alphabet from C to P and, after she realized that she had passed M, apologized. Gill explained that defendant's

recitation showed a lack of attention to the directions and such a result is consistent with being under the influence of cannabis.

¶ 17 As part of his protocol, Gill examined the inside of defendant's mouth. He observed a green and white film or "sludge" on defendant's tongue, raised taste buds, and a green leafy substance on her molars. He also smelled the faint odor of alcohol and the odor of freshly burnt cannabis on defendant's breath as he was conducting the test. Based on his observations, he concluded that they were consistent with the recent consumption of cannabis. Gill repeated the test at the station and made similar observations. Also at the station, Gill shined an ultraviolet light into defendant's mouth, and he observed a fluorescent glow on defendant's tongue. Gill explained that chlorophyll will fluoresce under ultraviolet light and, because it was present on defendant's tongue, was consistent with the possible consumption of cannabis.

¶ 18 The trial court also watched the recordings admitted into evidence. Specifically, the court observed the recording of the scene and of the administration of the testing in the station. At the station, Gill asked defendant the date, and defendant thought it was February 7 or 9. At the time he asked the question, it was in the early morning hours of February 11. Defendant also mistook the time to be 10 or 11 p.m. when the correct time was shortly after midnight. Gill took defendant's blood pressure, which was elevated.

¶ 19 Gill administered the darkroom test at the station. The darkroom test is designed to measure how the subject's pupils respond to light. Gill also used a card with various pupil sizes on it and was held up to defendant's eyes to measure the size of her pupils. Defendant's response to light was consistent with cannabis use as was the resting size of her pupils, which were dilated above the norm.

¶ 20     As part of his evaluation, Gill asked defendant to rate her level of impairment on a scale of 1-10, with 1 being completely sober and 10 being the most impaired she had ever been. The purpose of the self-rating test is to ascertain whether the subject understands that he or she is impaired. Defendant responded that her level of impairment was a four. Defendant appeared drowsy, which could have been from fatigue. When asked, however, defendant reported that she had slept for 11 hours the previous night, that she took a sleeping pill every night at 8 p.m., and that she had not taken the pill yet that night.

¶ 21     Defendant was asked to submit to a Breathalyzer test, a blood draw, and to a urinalysis. She declined to undergo all the tests.

¶ 22     Gill opined that, based on defendant's elevated blood pressure, the various tremors he observed, her elevated pulse, his observations, and the totality of the circumstances, she was under the influence of drugs and alcohol. Gill further opined that defendant could not safely operate a motor vehicle.

¶ 23     Gill was the only witness for the State. After his testimony was concluded, defendant moved for a directed finding, arguing that defendant was not under the influence of alcohol or cannabis or both, only that there was a possibility that defendant had consumed alcohol or cannabis.

¶ 24     The trial court first considered the evidence regarding alcohol. Based on the testimony regarding the field sobriety testing at the scene and the court's own observations of defendant in the recordings, particularly her lack of slurred speech, the court concluded that the State had failed to prove that she was under the influence of alcohol, and that failure also applied to the combined influence of alcohol and other drugs.

¶ 25    The trial court proceeded to consider the charge of DUI cannabis. We reproduce the court's comments because, in rendering its verdict at the close of the proceedings, the court relied on these remarks and incorporated them in its decision:

"[W]e have a driving component, which is always of most interest to the Court. This was not a simple situation where the defendant did a California stop at a stop sign. From the Court's view of it, it looks like the vehicle was going about 20 miles an hour through the stop sign. It didn't even look like it was fazed by the stop sign, and it went through at a dangerous clip through that stop sign.

    Now that always—a traffic offense in and of itself, as [defense counsel] correctly points out isn't always indicative, but I believe in this case does show impaired driving. There were other—there was—obviously from that driving, it appeared either as if the defendant was oblivious to the stop sign or didn't care. In either case, that was a dangerous situation. I would note that when the officer had an encounter with the defendant, the defendant at one point said well, it was the other officer that showed me this, and it was the same officer that had performed the [horizontal gaze nystagmus test] in the car. [Defendant] wasn't even aware that she was talking to the same officer.

    Now there was the denial of consumption of cannabis on that night. That is not the only issue or the only thing that was said. The exact statement was he asked her about the odor in the car, but she did state that someone else—or she said—I'm sorry. I want to quote this exactly. The officer asked because of the strong odor of cannabis, did somebody just smoke in the car, and [defendant] responded yes. She's the only occupant in the car.

The Court doesn't have to necessarily believe that statement. The Court could find that to be a false exculpatory statement.

In addition there, the defendant later, when confronted about whether she smoked, denied again, but then when told by the officers look, be honest with us, she then admitted that she consumed or smoked cannabis the previous Saturday. It also would indicate that her denial of consuming cannabis was belied by the facts. There was a very strong odor of cannabis—burnt cannabis in the car, there was a strong odor of burnt cannabis on her breath, she had green, leafy substance in her teeth, she had green sludge on her tongue.

And again, I want to be clear on this with respect to the—how the Court has interpreted this other evidence. Most of these were just simply observations. The elevated pulse, the white cotton mouth, and the spittle in the corner of the mouth, and the tremors, and the rebound dilation. The Court is not saying that that indicated to the Court impairment. It indicated to the Court possible consumption of cannabis, which again, belies the defendant's statement that she had not consumed cannabis on that evening.

And again, as I stated, her statement was did you smoke? She says no. The officer says well, there's a really strong odor in the car and asked her if someone just smoked in the car. Her response was yes. And then again, we have an admission that at least at some point she did smoke cannabis. So it's not a complete denial, but it is a denial as it relates to the recency of it.

Again, I find that to be false exculpatory statement. There were not other occupants in the car. There was circumstantial evidence of the odors and no other occupants. The Court didn't find her statement of her denial to be truthful. And this was a significant factor

in [*People v. McPeak*, 399 Ill. App. 3d 799 (2010)]. And in that case it reversed a conviction for any amount of alcohol in a person's blood, breath, or urine and noted for the record that in that case that the officer did not note any odor of cannabis on the individual's breath. That was noted here. The officer noted that it was—the odor of burnt cannabis on her breath.

Now again, as it relates to the field sobriety tests, again, there was a lot made of the fact of whether the standard field sobriety tests [versus] non-standardized field sobriety tests. The Court is more interested in the observations that come with that. And as all the parties are aware, I look at a number of other factors when I'm determining whether the person is under the influence of alcohol. We even take from the officer's testimony these field sobriety tests aren't gauged necessarily for cannabis. But I can still make observations—or I'm sorry, he can still make observations, and I can make conclusions from those observations. So again, that is—as it relates to the Romberg test and as it relates to the finger-to-nose test and the alphabet test.

And again, as I indicated, I'll refer to them generally as the eye tests. All that showed to the Court was possible consumption of cannabis. And remember, I think that the *Lenz* case points out where we have a situation where his foundation of his expertise is stipulated to. He can get into what he's observed in the past and what his experience is, his anecdotal evidence of what he has done to come to those conclusions, and that he's got the qualifications based upon this DRE expertise to render that opinion. And again, the Court only permitted it as it related to the possible consumption of cannabis.

As it relates to the walk and turn test on the scene, there was no doubt she didn't follow the instruction. She raised her arms. And I would have considered that a failure, and that could indicate impairment—or that did indicate impairment.

The one-leg stand on the scene, I think even the officer qualified that as a pass.

The Romberg test, I'm not even as concerned—and I wasn't necessarily considering it as far as the time distortion, but the observations of the tremor of the eyelids. The Court did notice a sway when she was closing her eyes. In fact, whenever she was asked to close her eyes, she began to sway.

And again, the near point convergence was consistent with marijuana use was the testimony—or the possible use of marijuana.

Finger-to-nose, again, it was those same observations. Her eyes were closed, she begins to sway. I would note that again with her inability to follow instructions was that time where she puts her finger to her nose and kept it there. And even at the time he instructs her, the officer says what did I tell you to do when I tell you to touch your finger to your nose, and then she finally realizes and moves her hand off. That's an inability to follow instructions, which we all know as—if he's [sic] driving a vehicle is a—he's [sic] splitting divided attention task, and she's not able to get instructions and then perform those instructions, which is similar to the task of driving a motor vehicle.

She also messes up the one time when he does the right-left, right-left, left-right, and she starts to move her hand. Now she doesn't touch her nose, but it does show that she's not following instructions. She also was moving her head forward on those tests again, not listening to instructions.

The alphabet, just—again, it's a pretty simple test. It's not a situation where I've heard evidence with respect to a language barrier. It's an inability to follow instructions. She has a delayed response and then acknowledges she went too far. Again, that's almost like the stop sign. When she was initially stopped, she asked the officer why did you stop me. She had no clue whatsoever that she had basically blown through a stop sign. Again—that again shows—with her inability to keep her head tilted back, not closing her eyes as instructed on the finger to nose and the Romberg test that she is not following instructions, and she had to be repeatedly told to do so.

Throughout all those tests, if I'm just—I'm not looking at them as a standard field sobriety test or as something scientifically based, but I'm basing observations—or conclusions off those observations. I think it showed a lack of attention, a lack of concentration, and also a lack of coordination. She was slow and lethargic in her movements, and there was that time distortion. I think it was more telling when it was asked about the date when she thought it was February 7 or February 9, and it was actually February 11. I noted it went over to midnight, but she was anywhere from a day to three days off. She didn't know what time it was. And again, it wasn't an outrageous amount of time, but again, it does show that her faculties were impaired. Finally, in the defendant's refusal of all chemical testing shows her consciousness of guilt."

¶ 26    The court denied defendant's motion for a directed finding on the charges of DUI cannabis and disobeying a stop sign and granted the motion regarding the DUI alcohol and DUI combination of alcohol and drugs.

¶ 27    Defendant testified on her own behalf. Defendant testified that, on February 10, 2020, from 11 a.m. to 5 p.m., she worked at her job as a bartender in Roselle. Defendant amended her answer and explained that, actually, she left her workplace at 7 p.m., after she had clocked out at 5 p.m., spending the extra time cleaning up. She then drove to Oak Lawn to have dinner with her boyfriend at a Mexican restaurant with the trip from her job to the restaurant taking 54 minutes to drive. She and her boyfriend drove separately and met at the restaurant. She did not recall what she ate at the restaurant. Defendant had a margarita before the meal and ate the meal after her drink.

¶ 28    After the dinner, defndant sat in her car with her boyfriend for 30-40 minutes. Defendant let her boyfriend smoke cannabis in her car, which accounted for the odor of freshly burnt cannabis reported by Gill. Defendant explained that she let him smoke in her car instead of his own car because her car had tinted windows and her boyfriend's car did not. According to defendant, she "made out" with her boyfriend which could have accounted for the presence of cannabis debris in her mouth.

¶ 29    Defendant testified that she experienced anxiety and had been diagnosed with that and depression. Defendant explained that her conditions made it difficult for her to understand and to follow strict instructions. Defendant did not share these conditions with the officers because "they didn't really ask." However, defendant did tell Gill that she took medication for depression, and it was in her car at the time of the stop.

¶ 30    Defendant testified that she was tired from working that day and then going out for dinner. Defendant maintained that she was not impaired by drugs or alcohol and was safe to drive to her home. Defendant admitted that she failed to stop at a stop sign in Glen Ellyn. When Gill informed

defendant that she had failed to stop a stop sign, she replied, "Sorry, I was at work all day and I'm just trying to get home."

¶ 31    On cross-examination, defendant agreed that she "probably said" to Gill that she was returning home from work. She did not recall telling Gill the time she finished work, but conceded she "probably told" him it was 9 p.m. Defendant did not remember Gill asking her to quantify her level of impairment on a 10-point scale, and explained that, because she was frustrated, she probably just gave Gill a number.

¶ 32    Defendant explained her refusal to submit to toxicology testing. Defendant refused to undergo the Breathalyzer because she had been told it did not work accurately, and she refused a blood test because she did not believe in needles. Regarding a urine test, she admitted that, because she had smoked cannabis, she knew the urine test would return a positive result. Nevertheless, defendant did not refuse on that ground, but for personal reasons. Defendant elaborated that she had been raped previously, and during the field sobriety testing, she was uncomfortable with having to close her eyes in the presence of male police officers.

¶ 33    The trial court found defendant guilty of DUI cannabis and disobeying a stop sign. In explaining its decision, the court expressly noted that "[t]here was nothing about the defendant's testimony that" changed its mind from the analysis given in denying defendant's motion for a directed finding. In addition, the court determined that defendant was not "really believable at all," and it noted that defendant's own testimony was inconsistent and contradictory. Specifically, the court noted defendant's changing testimony about ending work at 5 p.m., changing that during her testimony to 7 p.m., and then telling the officer that she worked until 9 p.m. The court reasoned that her testimony was tantamount to an admission that she lied to the police officer when she

stated she was returning home from work even though she had been out with her boyfriend. The court also noted that defendant's testimony was little more than "[coming] up with one convenient excuse after another."

¶ 34    The trial court determined Gill "to be entirely credible." It was also impressed with the thoroughness of Gill's drug recognition examination. The court highlighted that, unlike the ordinary case in which field sobriety testing is performed "in like two or three minutes," Gill spent "several hours" to make sure he accurately assessed her condition.

¶ 35    On July 29, 2021, the trial court passed sentence. The court stated orally:

> "the defendant on [the DUI drug count] will be placed on one-year court supervision, level II-S counseling, Victim Impact Panel, $75 fine plus the assessment. I do not find her to be an appropriate candidate for supervision on [the disobeying a stop sign count] based upon her driving history. Conviction and $75."

Notwithstanding the court's oral pronouncement, the written orders state that, for the DUI cannabis conviction, defendant was sentenced to a 12-month term of court supervision, and for the disobeying a stop sign conviction, defendant was sentenced to a 12-month term of conditional discharge.

¶ 36    Defendant timely appeals.

¶ 37                                    II. ANALYSIS

¶ 38    On appeal, defendant challenges the sufficiency of the evidence regarding her DUI cannabis conviction. She specifically argues that the State failed to prove beyond a reasonable doubt the element that she was incapable of safely driving her vehicle. Defendant also argues that

her sentence for disobeying a stop sign exceeded the maximum permissible sentence for that offense. We address each contention in turn.

¶ 39       A. Sufficiency of the Evidence—Inability to Safely Operate Her Vehicle

¶ 40    Defendant first argues on appeal that the State failed to prove her guilty of the offense of DUI cannabis because it did not prove beyond a reasonable doubt that she was incapable of safely operating a motor vehicle. A challenge to the sufficiency of the evidence requires the reviewing court to determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Jackson*, 2020 IL 124112, ¶ 64. This standard apportions to the trier of fact the responsibility of fairly resolving any conflicts in the testimony, weighing the evidence, and drawing reasonable inferences from the evidence. *Id.* The reviewing court does not substitute its judgment for that of the trier of fact on issues involving the weight of the evidence or witness credibility. *Id.* A reviewing court will not set aside a criminal conviction due to a challenge to the sufficiency of the evidence unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *Id.*

¶ 41    The DUI statute provides: "A person shall not drive or be in actual physical control of any vehicle within this State while: *** under the influence of any other drug or combination of drugs to a degree that renders the person incapable of safely driving." 625 ILCS 5/11-501(a)(4) (West 2020). We initially note that the offense charged here, DUI cannabis, has the following elements: a person is prohibited from (1)(a) driving or (b) being in physical control of a vehicle; (2) while under the influence of cannabis; (3) to a degree that renders the person incapable of safely driving. *Id.* Defendant does not challenge the first element of driving or being in control of a vehicle.

Defendant purports to challenge the second and third elements, namely of being under the influence of cannabis and being incapable of safely driving. A careful review of her argument, however, reveals it is directed only at the third element of being incapable of safely driving, and she provides no argument regarding the second element of being under the influence of cannabis. Specifically, defendant contends that: "it was not enough for the State to prove that [defendant] had consumed [cannabis] sometime prior to driving her vehicle; it had to show that the consumption caused her to be unable to safely drive the vehicle." As a practical matter, the second and third elements may not be as easily separated as they are distinctly set forth in the statute. To the extent that they can, however, defendant has argued only that the State failed to prove her incapability of safely driving, thereby forfeiting any separate challenge to the element of being under the influence of cannabis. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020), *People v. Dabbs*, 239 Ill. 2d 277, 294 (2010) (party forfeits review of an issue not argued on appeal). We therefore focus on the sufficiency of the evidence regarding whether defendant was incapable of safely driving her vehicle.

¶ 42    The evidence showed that defendant did not stop for the stop sign. The trial court, after viewing Gill's dashboard camera recording, estimated that defendant traveled through the stop sign at about 20 miles an hour. Regardless of the accuracy of the court's estimate, defendant proceeded through the stop sign without slowing, either while approaching the stop sign or after she had passed it. Defendant herself admitted that she "blew" the stop sign and rolled through it. The court reasonably inferred that defendant's driving led to "a dangerous situation."

¶ 43    Gill testified that he detected the odor of freshly burnt cannabis and observed that defendant's eyes were bloodshot, and her pupils were dilated. Based on his observation, Gill

proceeded to conduct a full drug recognition evaluation. Gill conducted field sobriety tests at the scene and at the station, explaining that, while the standard field sobriety tests are calibrated for alcohol consumption, they can also indicate that a subject has consumed other drugs. For example, on the walk-and-turn test, defendant had difficulty in following Gill's instruction and in performing the test. Likewise, when defendant performed the modified Romberg test, Gill observed tremors, swaying, and defendant could not accurately gauge the passage of time, all of which corresponded to cannabis use. Defendant's performance on the finger-to-nose test and the convergence test were also consistent with cannabis usage. Likewise, defendant did not follow the directions of the alphabet test, which indicated a lack of concentration and possible impairment from cannabis usage.

¶ 44    Gill also performed physical tests. Gill observed a green and white film on defendant's tongue, raised tastebuds, and green leafy matter in defendant's mouth and the odor of burnt cannabis on her breath which, he testified, was consistent with recent cannabis use. Gill measured defendant's pulse and blood pressure, both of which were elevated above the norm. Gill observed that the dilation of defendant's pupils persisted throughout his observations from the scene to the station, and he observed that, when exposed to light, her pupils reacted in a fashion consistent with cannabis usage. Based on his expertise and observations, Gill opined that defendant was under the influence and impaired from cannabis to the extent that she was incapable of safely driving.

¶ 45    The trial court rejected Gill's conclusion regarding alcohol but, in viewing the recordings and evaluating the testimony, determined that defendant was impaired from recent cannabis usage. The court noted that, after the full presentation of evidence in the case, it continued to believe that the State had proved the essential elements of DUI cannabis beyond a reasonable doubt. The court

expressly evaluated Gill's testimony and found him to be credible. Conversely, the court determined that defendant's testimony was not credible, particularly her reasons for refusing testing. The court further noted that defendant admitted that she allowed her boyfriend to smoke cannabis in the car as a way to explain the odor of freshly burnt cannabis, and inferred that, along with the physical indicia of recent cannabis use that Gill observed, she could also have effectively been "hotboxing" in her car and consuming cannabis as her boyfriend smoked. The court also observed that defendant's failure to stop at the stop sign was indicative of impairment as was her failure to recognize Gill as the same officer who administered various tests while she remained in her vehicle. The court determined that defendant's explanation of why she refused to undergo toxicological testing, like a blood draw or urinalysis, was incredible. Instead, it inferred that her refusals constituted consciousness of guilt.

¶ 46    We have carefully reviewed the record and find the trial court's determinations to be amply supported by the evidence. We conclude that, based on this record, any reasonable trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found that the State proved beyond a reasonable doubt that defendant was incapable of driving safely.

¶ 47    Defendant disputes the sufficiency of the evidence by emphasizing favorable evidence and essentially ignoring Gill's hours of observation and testing during the evening of February 10 and morning of February 11, 2020. Specifically, defendant highlights the apparent ease with which she got out of her vehicle at the scene, that she did not stumble, and that she was able to pass Gill her license and insurance information without fumbling. Defendant then wholly ignores the testing administered at the scene. Next, defendant skips ahead to her entrance into the police station and

highlights her ability to exit the police vehicle without assistance and without wobbling or swaying,

¶ 48    We note that the trial court viewed the recordings at issue, including the particular moments highlighted by defendant, and we note that defendant has specifically highlighted about two minutes out of the hours of recordings and was aware of both defendant's success in completing the tasks of exiting vehicles as well as her performance on the testing.  Indeed, defendant has not discussed the significance of the on-scene testing and her performance, and defendant has not discussed the significance of the repeated testing at the station and her performance.  Recognizing this lack, defendant minimizes Gill's observations and conclusions as only indicative of possible cannabis consumption, wholly overlooking Gill's opinion, based on his training, expertise, and experience that defendant was unable to safely drive her vehicle due to being under the influence of alcohol and cannabis.  Moreover, defendant does not discuss the trial court's interpretation of the evidence and its inferences and conclusions drawn from the evidence, including Gill's observations and opinions.

¶ 49    We note that the evidence in the record neither unequivocally supports the State nor unequivocally supports defendant.  Some evidence shows defendant having little difficulty moving about the scene and through the entry to the station.  Other evidence, however, shows defendant struggling to perform the tests as instructed, unable to remember the day, failing to recognize the officer with whom she just interacted, and, of particular importance, driving at speed through the stop sign with no indication that she realized the stop sign was there.  Our determination that there was sufficient evidence from which to conclude beyond a reasonable doubt that defendant was incapable of safely driving does not mean that the evidence was completely one-sided; it means

that, viewed in the light most favorable to the prosecution, any rational trier of fact could find beyond a reasonable doubt that defendant was incapable of safely driving. In other words, it means that there is ample evidence in the record to support the conclusion that defendant was incapable of safely driving even though in the couple of minutes out of the hours of recordings that defendant specifically highlights, she successfully exited vehicles and moved short distances.

¶ 50 Defendant argues that the evidence showed only that she consumed cannabis, not that she was impaired or unable to safely drive her vehicle. We agree with defendant that it is long and well settled that evidence of consumption does not equate to evidence of impairment or inability to drive safely. See, *e.g.*, *People v. Shackles*, 44 Ill. App. 3d 1024, 1026 (1977) (evidence of consumption alone is insufficient to prove impairment). While it is true that the evidence strongly rebutted defendant's claim that she had not consumed cannabis that day, considered in its totality, it was ample to conclude that defendant was also impaired to an extent that rendered her incapable of safely driving. While each individual test performed by Gill was indicative of consumption of cannabis, there were also observations made during the testing and interpretations of the testing results that supported the conclusion of impairment. For example, in the divided attention testing, like the alphabet test or the one-leg stand, defendant did not follow the directions Gill had given. Gill also observed, and the trial court noted that it also observed from the recordings, that defendant appeared drowsy and lethargic throughout the encounter. The court also emphasized defendant's passage through the stop sign and noted the danger it posed. From the testing, the results of the testing, the observations made during the testing and throughout the interaction, there was ample evidence to support the trial court's conclusion beyond a reasonable doubt that defendant was incapable of safely driving.

¶ 51    Defendant argues that the cases discussing consumption versus impairment seem to require more obvious impairment than she exhibited.  For example, defendant cites *People v. Lenz*, 2019 IL App (2d) 180124, ¶ 118, in which the defendant was found to be incapable of safely driving and the evidence showed that the defendant had been involved in two car accidents within a brief period, and the recordings showed the defendant to be " 'struggling with a lot of very basic motor function skills.' "  Defendant argues that, in contrast, here, the evidence was much weaker.  Even if we accept defendant's characterization, we nevertheless conclude that the evidence was sufficient.  Defendant exhibited signs of impairment in the walk-and-turn test, was unable to reliably follow the instructions given for the various tests, exhibited a lack of attention and coordination, could not remember the date, and was unable to gauge the passage of time, all of which factored into the trial court's determination.

¶ 52    Defendant maintains that "far more" is required before a trier of fact can "find impairment to such a degree to render a defendant unable to safely operate a car."  In support of this "far more," defendant cites *People v. Cortez*, 361 Ill. App. 3d 456 (2009), in which the defendant was involved in a one-vehicle rollover accident.  *Cortez*, however, is distinguishable, because the defendant in *Cortez* was not convicted of DUI under section 11-501(a)(4) (incapable of safely driving) but was convicted of DUI under section 11-501(a)(1) (blood alcohol in excess of 0.08) (615 ILCS 5/11-501(a)(1) (2020)).  *Id.* at 458.  The defendant's incapacity to safely drive was not at issue in *Cortez*, and the court was not required to consider whether the defendant was incapable of safely driving.  *Cortez*, therefore, is wholly inapt.

¶ 53    As a second example of "far more," defendant cites *People v. Hewitt*, 212 Ill. App. 3d 496, 504 (1991), in which the police observed that defendant's vehicle "weaved between the center line

to the curb four to seven times." Rather than providing "far more," the defendant's "weaving" within his lane in *Hewitt* seems at least on par with defendant here approaching and driving through the stop sign without slowing or reacting once she passed through it. Moreover, while the defendant in *Hewitt* stumbled exiting his vehicle, leaned against it for balance, and swayed (all of which was disputed by the *Hewitt* defendant), here, defendant exhibited tremors, lack of coordination in the testing administered by Gill, swaying, time distortion, and confusion. Further in *Hewitt*, the police witnesses concluded, based on their experience, that the defendant was under the influence of alcohol; here, similarly, Gill opined, based on his training, experience, and expertise, that defendant was under the influence of cannabis. The primary difference between *Hewitt* and this case is that defendant here did not stumble or need to balance herself against her car. Otherwise, the "far more" demanded by defendant is present in this case, too: defendant exhibited tremors, lack of coordination, lack of attention and focus, and dangerous driving. *Hewitt*, then, supports, rather than rebuts, the conclusion that the evidence was sufficient to prove beyond a reasonable doubt that defendant was incapable of safely driving. In other words, to the extent that *Hewitt* is properly interpreted as exemplifying the "far more" that is required to prove the incapacity to safely drive, the types of evidence relied on in that case are also present here.

¶ 54 Defendant disputes the soundness of Gill's opinion that she was impaired because, according to her, it was based only on indicia of consumption. However, defendant overlooks indications of impairment, like being unable to reasonably gauge the passage of time, not knowing the date, not recognizing Gill moments after he administered testing as the officer who administered the testing, and overtly dangerous driving, along with persistent drowsiness and lethargy. Moreover, Gill made observations during the testing, such as tremors, swaying, and the

like, that, based on his training, expertise, and experience, he used in formulating his opinion regarding impairment. We reject defendant's argument that Gill's conclusion must be discounted because he testified only about consumption. When we consider all of Gill's testimony and the totality of the evidence presented, it includes much more than only testimony about possible consumption of cannabis.

¶ 55 Defendant also disputes Gill's and the trial court's reliance on her self-evaluation of impairment. Gill testified that he asked defendant to rate her impairment on a scale of 1 to 10 with 1 being completely sober and 10 being the most impaired she had ever been. Defendant responded with a self-rating of four. Defendant argues that Gill did not testify about what number indicates an inability to safely drive and that she could have believed the "four" was below the line for impairment, while "five" could have represented impairment. The trial court specifically, and reasonably, inferred that, had defendant believed that she was not impaired, she would have reported a rating of zero or one. Defendant's argument here ignores the directions given by Gill for the self-reporting of impairment. Moreover, defendant's report of an impairment level of 4 out of 10 indicates, consistent with Gill's testimony, that she understood she was at some level of impairment at that time. It is not an unreasonable inference, especially considering the court's credibility determination, that she was edging her self-report downward, and, in any event, it demonstrates she was aware that she was at least somewhat impaired. We emphasize that the trial court did not find the self-report entirely conclusive, and neither do we. It is instead an indication of impairment and defendant's contemporaneous awareness that she was, at least, somewhat impaired despite her denial of any cannabis consumption that night. As such, it supports the trial court's determination rather than rebuts it.

¶ 56     Defendant next argues that the trial court's credibility assessment of Gill's testimony and her testimony begs the question of whether the State proved beyond a reasonable doubt that she was incapable of safely driving. While this contention is true to an extent, defendant's testimony tried to explain why she would not close her eyes when instructed, which went to her ability to comprehend and follow instructions and to divide her attention among tasks, which served as a proxy for driving a car. Likewise, defendant's testimony attempted to explain why there was a strong odor of cannabis in her car, and why she reported that she was impaired at a level of 4 out of 10. The court assessed credibility and did not accept defendant's explanations as to why Gill was able to make some of his observations and why she was unable to successfully perform some of the tests Gill administered. Thus, while defendant's credibility compared to Gill's does not answer the question of whether she was impaired and could not safely drive her vehicle, it certainly sheds light on that ultimate question. We reject defendant's contention.

¶ 57     For the foregoing reasons, therefore, we find the evidence in the record sufficient and ample to prove beyond a reasonable doubt that defendant was incapable of safely driving. See 625 ILCS 5/11-501(a)(4) (West 2020). We therefore affirm defendant's conviction for DUI cannabis.

¶ 58                                B. Improper Sentence

¶ 59     Next, defendant contends that the written order on her conviction for disobeying a stop sign imposed an excessive 12-month term of conditional discharge when the maximum sentence is only a 6-month term. 730 ILCS 5/5-4.5-75 (West 2020). It is well settled that the written judgment is evidence of the trial court's judgment, but it is the court's oral pronouncement that is the judgment of the court. *People v. Carlisle*, 2015 IL App (1st) 131144, ¶ 87. When the court's oral pronouncement conflicts with its written order, the oral pronouncement controls. *Id.*

¶ 60    Here, the trial court stated orally:

"the defendant on [the DUI cannabis count] will be placed on one-year court supervision, level II-S counseling, Victim Impact Panel, $75 fine plus the assessment.  I do not find her to be an appropriate candidate for supervision on [the disobeying a stop sign count] based upon her driving history.  Conviction and $75."

The written order, by contrast, stated that defendant was sentenced to a 12-month term of conditional discharge, which conflicts with the oral pronouncement.  Therefore, the oral pronouncement controls, and the court entered conviction for disobeying a stop sign and imposed a $75 fine.  Accordingly, we vacate that part of the written order imposing the 12-month term of conditional discharge.  The remainder of the order stands.

¶ 61                                III. CONCLUSION

¶ 62    For the foregoing reasons, we affirm as modified the judgment of the circuit court of Du Page County.

¶ 63    Affirmed as modified.